**Shawn M. Lindsay, OSB #020695**
shawn@hbclawyers.com
**Craig R. Berne, OSB #874202**
craig@hbclawyers.com
Harris Berne Christensen LLP
15350 S.W. Sequoia Parkway, Suite 250
Portland, OR 97224
Telephone: (503) 968-1475
Fax: (503) 968-2003

Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THE INTELLICAD TECHNOLOGY CONSORTIUM,<br><br>Plaintiff,<br><br>v.<br><br>SUZHOU GSTARSOFT CO. LTD.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT, TRADE SECRET MISAPPROPRIATION, BREACH OF FIDUCIARY DUTY**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff The IntelliCAD Technology Consortium ("the ITC"), for its Complaint against

defendant Suzhou Gstarsoft Co. Ltd. ("Gstar"), alleges as follows:

### PARTIES

1.      Founded in 1999, the ITC is a consortium of computer aided design ("CAD")

software developers who develop and maintain the IntelliCAD software platform ("IntelliCAD"),

which is used for developing digital design solutions. Unlike other CAD applications, the ITC does

not sell IntelliCAD directly to end users. Instead, the ITC licenses IntelliCAD to consortium members who pay annual fees in exchange for permission and guidance to either (1) sell IntelliCAD as-is to end users; or (2) build on top of IntelliCAD their own proprietary products. Both options are sold with their own end user license agreements. Most ITC members create their own end user software solutions in the architectural, engineering, construction, manufacturing, geospatial mapping, forensics, and digital media industries. Companies around the globe use solutions built on IntelliCAD to create digital models and workflows that allow visualization, simulation, and analysis of designs before they are manufactured and to create engineering design documents used for manufacturing. The ITC is a Washington state non-profit corporation with its corporate headquarters at 10260 S.W. Greenburg Road, Suite 400, Portland, Oregon 97223.

2.      Upon information and belief, defendant Gstar is a corporation organized under Chinese law with its principal place of business at 5F Unit C, Building 201, No. A10 Jiuxianqiao North Road, ChaoYang District, Beijing 100015, People's Republic of China.

3.      Gstar develops and distributes worldwide software products including "GstarCAD," "GstarCAD Pro," and "GstarCAD Std," as well as discipline-specific solutions "GstarCAD Mechanical" and "GstarCAD Architectural" (each based on the GstarCAD foundation). These products can be downloaded and purchased directly from www.gstarcad.net in the United States.

4.      Gstar was a member of the ITC, beginning back in the early 2000s, and had entered into a written commercial membership agreement with the ITC, as that agreement was amended from time to time. The most recent commercial membership agreement between the ITC and Gstar was dated January 1, 2013, which incorporated Membership Rules, as that term is defined in the commercial membership agreement (the "CMA"). Attached hereto as Exhibit A and by this

reference incorporated herein is a true and correct copy of the CMA. As a contract subject to Oregon law, the CMA contained an implied covenant of good faith and fair dealing to protect the parties' reasonable contractual expectations, including but not limited to the ITC's expectation that Gstar would refrain from unauthorized use or disclosure of the ITC's trade secrets.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the ITC's copyright and trade secret misappropriation claims under 28 U.S.C. §§ 1331, 1338(a), 1338(b), and 1367(a). The Court also has diversity jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00.

6.     This Court has personal jurisdiction over the parties, specifically because the ITC and Gstar agreed in paragraph 9.5.3 of the CMA that "[e]ach party consents to personal jurisdiction in Oregon * * *." Gstar has purposefully availed itself of the benefits and privileges of the State of Oregon by entering into a contract (the CMA) with a non-profit corporation headquartered in Oregon (the ITC) and by agreeing in that contract to be subject to personal jurisdiction in Oregon. Gstar has the requisite minimum contacts with the State of Oregon sufficient that the exercise of personal jurisdiction by this Court over this Defendant would not offend traditional notions of fair play and substantial justice and is thus permitted by the Oregon and United States Constitutions.

7.     Venue in this Court is proper because, pursuant to paragraph 9.5.3 of the CMA, the parties agreed that, "[a]ll actions or suits by a party shall be brought and maintained in Portland, Oregon * * * [and] [e]ach party * * * waives any right to seek a change of venue." Further, venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred or a substantial part of property that is the subject of the action is situated in this District.

## BACKGROUND

### A.     The ITC's and IntelliCAD's History.

8.     In March 1997, Visio Corporation acquired IntelliCAD from Boomerang Technology Inc., a privately held developer of .dwg file compatible software, located in San Diego, California. Under the terms of the acquisition agreement, Visio Corporation retained the development team and acquired source code and certain other assets for cash payments totaling $6.7 million.

9.     Visio Corporation held a strong presence in the technical drawing market with Visio Technical, which held a 52 percent market share in units among comparably priced products. Being able to offer a .dwg compatible CAD platform like IntelliCAD enabled Visio Corporation to better meet the needs of its existing users and open the door to new users who needed the precision, functionality, and features of a full CAD platform.

10.     With native support for .dwg files and the high level of compatibility with popular AutoCAD commands and application program interfaces ("APIs"), IntelliCAD provided a new benchmark for CAD platform value. Visio Corporation shipped the first commercial version, IntelliCAD 98, in March 1998.

11.     Although Visio Corporation spent an estimated $25 million on acquiring, developing, and marketing IntelliCAD, in 1999 Visio Corporation divested itself of IntelliCAD by creating the ITC and granting the consortium an exclusive, irrevocable license to the IntelliCAD source code. The IntelliCAD divestiture occurred just before Visio Corporation was acquired by Microsoft for $1.2 billion in early 2000.

12.     As an independent, non-profit corporation directed by its members, with the IntelliCAD source code at a high value and being a powerful CAD development platform, the ITC

membership grew. ITC members pay an annual license fee and receive access to the IntelliCAD source code, development tools and processes, and distribution rights. But in exchange, members agree to strict protective provisions, via a commercial membership agreement, on source code use and the creation of competitive or derivative CAD platforms. The ITC Bylaws and Membership Rules were designed to keep the consortium open to all members while protecting the intellectual property from abuse, providing all members a safe CAD platform on which to build their business.

13.     Since the initial creation of the consortium, the ITC has continually developed and enhanced the IntelliCAD platform, development tools, and processes. With over 25 releases, millions of dollars in direct investment, plus countless member-hours donated since 1999, the members highly value their investment in the consortium's intellectual property – the IntelliCAD base software source code.

14.     Through its commitment to quality and innovation, the ITC has established tremendous goodwill. IntelliCAD-based applications can be found in approximately 100 countries.

### B.    The ITC's Protected Trade Secrets and Copyrights.

15.     The IntelliCAD platform has been the cornerstone of the ITC since its introduction. IntelliCAD is not only the ITC's largest revenue-generating product, but also the platform that underpins the portfolio of all consortium members' design product offerings.

16.     The IntelliCAD source code constitutes the consortium's most valuable and closely guarded assets and trade secrets, and the ITC has gone to great lengths to protect it. Access to the source code is allowed only on an as-needed basis, and the ITC protects the source code by placing it in a secured source code repository. ITC members must execute agreements for source code access and distribution. Individual ITC employees, contractors, and member employees must execute agreements that require them to maintain the confidentiality of the ITC's trade secret

information, including the IntelliCAD source code. Pursuant to commercial membership agreements, ITC members agree, among other things, that (1) they will abide by the Membership Rules of the ITC as amended from time to time, particularly as they relate to use of the proprietary IntelliCAD software and derivative materials, (2) they will not combine the proprietary software with any software competing with the ITC, (3) they will pay any dues, fees, and assessments levied by the ITC on its members, (4) they, or the ITC, could terminate the membership upon thirty days' notice without terminating any obligations incurred before termination, (5) the ITC could suspend or terminate membership for a breach of the agreement, (6) the ITC has the right to audit member products to see if the ITC's proprietary information was being sold in violation of the ITC's Membership Rules, and if there was a breach of the agreement, impose a reasonable fine in the minimum amount of $100,000 for each breach, and (7) members would pay attorney fees and costs in a judicial proceeding that found a breach of the commercial membership agreement.

17.    The ITC also owns over 20 registered U.S. copyrights relating to its IntelliCAD platform. Examples include U.S. Copyright Registration Nos. TX0008732010, TX0008732017, and TX0008735270.

### C.    Gstar's History.

18.    Founded in 1992, Gstar emerged as an early industry leader in the Chinese CAD software market. Using the market-dominant AutoCAD as their platform of choice, Gstar created specific add-on solutions for architecture, mechanical, and electrical disciplines. Gstar joined the ITC as an associate member in 2001, then as a commercial member in November 2003. Gstar used the IntelliCAD platform to offer a lower-cost alternative as the base for their CAD solutions development. Licensing IntelliCAD saved Gstar millions of dollars and hundreds of man-years in

development, as they were able to ship solutions on a fully functional, low-cost .dwg compatible CAD platform that could compete with AutoCAD, within only a few months.

19.    Gstar first released IntelliCAD-based products in 2003. Subsequent IntelliCAD-based products include GstarICAD 2007, GstarICAD 2007 Pro, GstarICAD 2008, GstarICAD 2008 Pro, GstarICAD 2009, GstarICAD 2009 Pro, GstarICAD 2010, GstarICAD 2010 Pro, GstarCAD 2011, GstarCAD 2011 Pro, GstarCAD 2012, GstarCAD 2012 Pro, GstarCAD 2012 Extended, as well as several different discipline specific add-ons for architecture, mechanical, electrical, HVAC, and others. Up through GstarCAD 2012, Gstar experienced an impressive growth rate of over 300 percent per year overseas and 60 percent in China. As their IntelliCAD-based business grew, they dropped their AutoCAD-based business and turned their focus on creating an IntelliCAD-based platform of offerings that competed directly with AutoCAD.

20.    With additional revenue and resources, Gstar continued to improve the features and APIs of the IntelliCAD platform to compete with AutoCAD as both a base drawing engine and development platform. Through 2012, IntelliCAD-based GstarCAD grew to support more than 190,000 users – architects, engineers, and designers from more than 100 countries, supporting 13 languages.

### D.    Gstar Introduces its "New" GstarCAD Platform.

21.    While still a member of the ITC, in April 2013, Gstar revealed a new direction for its GstarCAD platform technology. Gstar claimed that it had developed an entirely new, independently designed codebase called "GstarCAD 8." The ITC was puzzled by Gstar's announcement because the "new" GstarCAD 8 product was incredibly similar to GstarCAD 2012, which was Gstar's last IntelliCAD-based product. Further, Gstar did not leave the consortium but

continued to pay its membership fees for 2013. Indeed, Gstar even had a representative on the ITC's board of directors through 2014.

22.     Pursuant to Section 2.3.5 of the CMA, Gstar was expressly prohibited from using the IntelliCAD Base Software, or any derivative works thereof, to combine with, merge with, integrate with, compile with, or create hybrid or competing CAD Software. As such, in the Fall of 2014, and pursuant to Section 3.5 of the CMA and Section 23 of the ITC Membership Rules, the ITC notified Gstar that it would exercise its right to perform a source code audit of GstarCAD 8.

23.     Gstar refused to cooperate or comply with the ITC in completing the GstarCAD 8 source code audit. Additionally, Gstar refused to pay its 2014 ITC membership dues and assessments. Moreover, Gstar began soliciting existing ITC members to leave the consortium and use Gstar's "new" platform instead of IntelliCAD.

24.     On April 2, 2015, the ITC gave Gstar 30 days' notice to cure its contract breaches. Gstar failed to do so and, consequently, the ITC terminated Gstar's commercial membership agreement on May 18, 2015.

### E.     ITC Takes Legal Action.

25.     In May 2015, the ITC initiated an arbitration proceeding against Gstar for breach of contract. On October 3, 2015, the arbitrator held the ITC prevailed on all disputed matters and issued an award in favor of the ITC ordering Gstar to undergo an audit of its CAD software platform and issuing a money judgment in favor of the ITC.

26.     On January 27, 2016, the U.S. District Court for the District of Oregon entered an order confirming the Arbitration Award requiring Gstar to undergo an audit of its CAD software platform, and to pay the money judgement with interest (U.S. District Court Case No. 3:16-mc-00061-MO). Gstar has refused to comply with the court order or pay the money judgment.

**F.     GstarCAD is Built on IntelliCAD Intellectual Property.**

27.     On information and belief, the ITC alleges that Gstar did not accomplish this remarkable development of GstarCAD 8 and its derivatives ("New GstarCAD") through innovation and honest labor, but by misappropriating significant portions of the ITC's proprietary source code. The New GstarCAD is not merely an IntelliCAD "work-a-like," and it does not just share similar interfaces and commands. In crucial and unmistakable ways, New GstarCAD performs identically to prior versions of IntelliCAD. This duplication, which is at the source code level, could not have been accomplished through coincidence or the application of similar programming logic. As ITC commercial members, Gstar developers had full access to the IntelliCAD source code.

28.     As described below, the New GstarCAD displays precise idiosyncrasies – features that could not have been introduced without the wholesale copying of significant portions of the ITC's proprietary source code. New GstarCAD has clearly been built by Gstar from IntelliCAD source code without the ITC's permission. Just a sampling of actual use and idiosyncrasies demonstrate Gstar's improper and illegal use:

a.     "icad.pat" and "icadiso.pat" are unique file names for *hatch pattern files* used only by IntelliCAD. "ICAD" is short for "IntelliCAD." Although Gstar appears to have attempted to modify, rename, and reformat the icad.pat and icadiso.pat files in New GstarCAD's code, Gstar failed to remove reference to those IntelliCAD .pat files in its New GstarCAD user guide:

**Choose and Define Hatch Patterns:** Hatch pattern consists of a repeating pattern of lines, dashes, and dots. You can select a hatch pattern from a set of predefined patterns, or you can define a pattern of your own. The hatch pattern you used most recently is the default pattern the next time you add hatching. The program supplies predefined standard hatch patterns, which are stored in the ICAD.pat and ICADISO.pat hatch pattern library files.



To specify a predefined hatch pattern:

1. Choose Draw > Hatch from the main menu.
2. In the Hatch and Gradient dialog box, click the Hatch tab.
3. Beside Type, click Predefined to apply a scale factor to make the pattern larger or smaller than the default size.
4. Enter the scale factor as a percentage of the default.

Additionally, *commands* listed in the New GstarCAD user guide are identical to *commands* unique to IntelliCAD. IntelliCAD's DNA remains in New GstarCAD.

b.      The "ICAD" *system variable* is unique to IntelliCAD and not found in other software code. Although it appears Gstar attempted to modify New GstarCAD's online help to rename and reformat the help file, original IntelliCAD help source code *system variables* are found in the New GstarCAD online help code:



If New GstarCAD truly was independently authored, then there should be no reference to IntelliCAD's "ICAD" *system variables*. The existence of IntelliCAD's "ICAD" *system variables* in New GstarCAD demonstrates that the New GstarCAD help files were derived from IntelliCAD source code.

c.      As AutoCAD work-a-likes, both IntelliCAD and New GstarCAD try to emulate over 800 *system variables* in AutoCAD. However, the New GstarCAD contains the following additional *system variables* that are unique to and only found in IntelliCAD:

|  |  |
|---|---|
| ACISOUTVER | AXISMODE |
| CYCLECURR | CYCLEKEEP |
| DIMFIT | MENUCTL |
| PROXYWEBSEARCH | SAVEIMAGES |
| FASTZOOM | UCSICONPOS |
| FITTYPE | HPSTYLE |
| ISLASTCMDPT | LASTCMDANG |
| LTSCLWBLK | PREVIEW_WIDTH |
| PREVIEW_HEIGHT | ZOOMPERCENT |
| SAVEDWGCHECKSUM | VIEWASPECT |
| TEXTANGLE | ICADVER |
| ICADPREFIX | |

If New GstarCAD truly was independently authored, then these above *system variables* would not be found in New GstarCAD.

d.      As IntelliCAD and New GstarCAD are both AutoCAD work-a-likes, they have hundreds of identical command names. However, the following *command names* are unique to and only found in IntelliCAD:

> TIPOFDAY
> WCASCADE
> WHTILE
> WVTILE

However, New GstarCAD contains these *IntelliCAD command names*. If New GstarCAD truly was independently authored as an AutoCAD work-a-like, then these above *IntelliCAD command names* would not be found in New GstarCAD.

e.      A file with a .dat file extension is a generic data file that stores specific information relating to the program that created the file. The sysvdlg.dat file of New GstarCAD is the system variable dialog data file that should only contain *resource strings* of New GstarCAD. However, the New GstarCAD sysvdlg.dat file contains the following *resource strings* that are unique to IntelliCAD (again, "ICAD" stands for IntelliCAD, emphasis added):

- Stores the **ICAD** serial number.
- Stores the **ICAD** build version number.
- Controls whether **ICAD** loads the **ICAD**.lsp file into every drawing or just the first drawing opened in an **ICAD** session.
- # **ICAD** PREFIX|String|Not saved|.
- Stores the directory path, if any, specified by the **ICAD** environment variable, with path separators appended if necessary.
- # **ICAD** VER|String|Not saved|.
- Stores the **ICAD** version number. This variable differs from the DXF file $**ICAD**VER header variable, which contains the drawing database level number.
- Sets the input method by which **ICAD** creates chamfers.\n\n0\tRequires two chamfer distances\n1\tRequires one chamfer distance and an angle.

- Controls whether **ICAD** echoes prompts and input during the AutoLISP command.
- For additional information on **ICAD** programming interfaces, see chapter 6, "Programming Interfaces," in the Customization Guide.
- Sets the multiline style that **ICAD** uses to draw the multiline.
- Controls the current plot style for new objects. The **ICAD** defined values are\n"ByLayer"\n"ByBlock"\n"Normal"\n"User Defined".
- **ICAD** resets the DBMOD value to 0 when saving the drawing.
- Specifies if and when **ICAD** demand loads a third-party application if a drawing contains custom objects created in that application.
- **ICAD** adds a leader to moved dimension text when DIMTMOVE is set to 1.

If New GstarCAD truly was independently authored, then these above *IntelliCAD resource strings* would not be found in New GstarCAD.

f.     *ICAD.LSP* file is a unique file name used only in IntelliCAD. This unique file name will automatically load LISP program functions into IntelliCAD on startup. New GstarCAD also contains the *ICAD.LSP* file. If New GstarCAD truly was independently authored, then the *ICAD.LSP* file would not be found in New GstarCAD.

g.     When a software program's source code is compiled, executable and dynamic-link library files (DLLs) are created. Compiling the code hides the source, but some DLL files that are used by multiple executables may expose function interfaces, or *classes* which can be called from the DLL file. DUMPBIN, a utility tool included in Microsoft's Visual Studio, allows a developer to examine an application's DLLs to find exposed interfaces. Using the DUMPBIN utility to examine New GstarCAD's DLLs reveals New GstarCAD is using the following *class names* of IntelliCAD's geometry library and dialog control language, which are unique to IntelliCAD:

|  |  |
|---|---|
| IcArray | IcString |
| IcGeMatrix | IcGeOctree |
| IcGePoint3d | IcGePoint |
| IcGePoint2d | IcGeVector2D |
| IcGeVector3D | IcGePolyline2D |

| | |
|---|---|
| IcGePolyline3D | IcGeQuadTree |
| IcGePlane | IcGeLine3D |
| IcGeLineSeg2D | IcGeInterval |
| dlg_action_tile | dlg_add_list |
| dlg_client_data_tile | dlg_dimensions_tile |
| dlg_done_dialog | dlg_done_positioned_dialog |
| dlg_end_image | dlg_end_list |
| dlg_fill_image | dlg_get_attr |
| dlg_get_attr_string | dlg_get_list_string |
| dlg_get_tile | dlg_load_dialog |
| dlg_mode_tile | dlg_new_dialog |
| dlg_new_positioned_dialog | dlg_set_tile |
| dlg_slide_image | dlg_start_dialog |
| dlg_start_image | dlg_start_list |
| dlg_term_dialog | dlg_unload_dialog |
| dlg_vector_image | |

If New GstarCAD truly was independently authored, then the above *class names* would not be found in New GstarCAD.

29.     Although Gstar has refused to comply with the court order to undergo an audit of New GstarCAD's source code repository, the above and an examination of New GstarCAD's binary files show Gstar has purposefully, actively, and voluntarily distributed New GstarCAD products and related applications and services – all based on IntelliCAD – in the United States.

30.     Fred Brooks stated, "The bearing of a child takes nine months, no matter how many women are assigned." *The Mythical Man-Month: Essays on Software Engineering* (1975, 1995), p.17. This analogy holds true for developing a complex CAD platform. All modern software development projects use source control systems. GstarCAD and New GstarCAD could not have been created without a source control system. If New GstarCAD truly was authored independently in just a few months' time by non-IntelliCAD trained developers, it would have taken hundreds of people. A simple audit of New GstarCAD's source control repository would verify. But, of course, Gstar refuses to do so.

## COUNT I

### (Copyright Infringement (17 U.S.C. § 501))

31.     The ITC hereby restates and re-alleges the allegations set forth in paragraphs 1 through 30 above and incorporates them by reference.

32.     The IntelliCAD platform contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101, *et seq.*

33.     Without consent, authorization, approval, or license, Gstar knowingly, willingly, and unlawfully copied, prepared, published, and distributed ITC's copyrighted work, portions thereof, or derivative works and continues to do so. Gstar's New GstarCAD products infringe the ITC's copyrights in the IntelliCAD platform and products, and Gstar is not licensed to do so.

34.     As Gstar was an ITC member and signed the CMA, Gstar is aware of the ITC's copyrights and restrictions on derivative works from its IntelliCAD platform. Gstar's infringement therefore is and has been knowing and willful.

35.     By its unlawful copying, use, and distribution, Gstar has violated the ITC's exclusive rights under 17 U.S.C. § 106.

36.     Gstar has realized unjust profits, gains, and advantages as a proximate result of its infringement.

37.     Gstar will continue to realize unjust profits, gains, and advantages as a proximate result of its infringement while such infringement is permitted to continue.

38.     The ITC is entitled to an injunction restraining Gstar from engaging in any further acts in violation of the United States copyright laws. Unless Gstar and its domains registrar (Alibaba) are enjoined and prohibited from infringing the ITC's copyrights, and unless all

infringing products and advertising materials are seized, Gstar will continue to intentionally infringe the ITC's registered copyrights.

39.    As a direct and proximate result of Gstar's direct willful copyright infringement, the ITC has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. The ITC is entitled to recover from Gstar, in amounts to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by Gstar as a result of Gstar's act of infringement and Gstar's use and publication of the copied materials, in no event less than $10,000,000.00.

## COUNT II

### (Trade Secret Misappropriation (Oregon Revised Statues 646.461, *et seq.*))

40.    The ITC hereby restates and re-alleges the allegations set forth in paragraphs 1 through 30 above and incorporates them by reference.

41.    The ITC's confidential information, including its IntelliCAD source code, constitutes information that has independent economic value because it is unknown to others and is the subject of reasonable efforts to maintain its secrecy or limit its use. It therefore qualifies as a trade secret within the meaning of Oregon Revised Statutes 646.461, *et seq.*

42.    The ITC did not make this information available to third parties without reasonable protections and safeguards on its use and could not have reasonably anticipated misuse of such information by its member such as Gstar.

43.    Without consent, authorization, approval, or license, Gstar knowingly, willingly, and unlawfully has acquired, disclosed, and/or used or intends to use the ITC's trade secrets through improper means.

44.     By virtue of the CMA and Gstar's status as a member of the ITC, Gstar had a duty to maintain the secrecy and limit the use of such proprietary information.

45.     Gstar's misappropriation of the ITC's trade secrets is and has been willful and malicious, such that the ITC is entitled to exemplary damages and its reasonable attorney's fees and costs (ORS 646.465 and ORS 646.467(3)).

46.     Gstar has realized unjust profits, gains, and advantages as a proximate result of its trade secret misappropriation.

47.     Gstar will continue to realize unjust profits, gains, and advantages as a proximate result of their trade secret misappropriation if such misappropriation is permitted to continue.

48.     The ITC is entitled to an injunction restraining Gstar from engaging in further acts of trade secret misappropriation. Unless Gstar and its domains registrar (Alibaba) are enjoined and prohibited from disclosing or using the ITC's trade secrets and all materials disclosing or derived from the appropriated information are seized, Gstar will continue to misappropriate ITC trade secrets. Gstar should also be required to inform any customer or re-seller to whom it has sold products utilizing the ITC's trade secrets that it has done so and that the customer or re-seller should no longer use any such product from Gstar.

49.     As a direct and proximate result of Gstar's misappropriation of the ITCs trade secrets, the ITC has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. The ITC is entitled to recover from Gstar, in amounts to be determined at trial, the damages it has sustained and will sustain, for its actual losses and any unjust enrichment obtained by Gstar as a result of Gstar's misappropriation of ITC's trade secrets, in no event less than $10,000,000.00.

## COUNT III

### (Breach of Fiduciary Duty)

50.     The ITC hereby restates and re-alleges the allegations set forth in paragraphs 1 through 30 above and incorporates them by reference.

51.     As a member of the ITC with a representative on the ITC's board of directors, Gstar owed fiduciary duties of due care and loyalty to its fellow members of the ITC.

52.     Gstar's fiduciary duties included the duty to exercise reasonable care on behalf of the ITC's interests, and duties to refrain from self-dealing, misappropriating trade secrets and other confidential information, violating the ITC's copyrights, and realizing secret profits at the expense of the ITC and/or its other members.

53.     Gstar breached the fiduciary duties it owed as specified above.

54.     As a direct and proximate result of Gstar's breaches of its fiduciary duties, the ITC has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. The ITC is entitled to recover from Gstar, in amounts to be determined at trial, the damages it has sustained and will sustain, for its actual losses and any unjust enrichment obtained by Gstar as a result of Gstar's breaches of its fiduciary duties, in no event less than $10,000,000.00.

### PRAYER FOR RELIEF

WHEREFORE, the ITC respectfully requests the following relief:

A.     A preliminary injunction prohibiting Defendant, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them (including its domains registrar Alibaba), from continued acts of infringement of the ITC copyrights at issue in this litigation, including, but not limited to, ceasing and desisting from the disclosure and/or multiplication of Gstar products based

on New GstarCAD (i.e., ceasing and not resuming the production, import, selling, offering for sale, lease, offering for lease, exhibiting, supplying, using, or having in stock Gstar products based on New GstarCAD);

B.      A permanent injunction prohibiting Defendant, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them (including its domains registrar Alibaba), from continued acts of infringement of the ITC copyrights at issue in this litigation, including, but not limited to, ceasing and desisting from the disclosure and/or multiplication of Gstar products based on New GstarCAD (i.e., ceasing and not resuming the production, import, selling, offering for sale, lease, offering for lease, exhibiting, supplying, using, or having in stock Gstar products based on New GstarCAD);

C.      Entry of judgment holding Defendant liable for infringing the ITC copyrights at issue in this litigation;

D.      A preliminary injunction prohibiting Defendant, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from disclosing, exploiting, or utilizing the ITC's confidential information, including but not limited to the IntelliCAD source code;

E.      A permanent injunction prohibiting Defendant, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with them, from disclosing, exploiting, or utilizing the ITC's confidential information, including but not limited to the IntelliCAD source code;

F.      Entry of judgment holding Defendant liable for misappropriating the ITC's trade secrets;

G.      An order that all copies made or used in violation of the ITC's copyrights or trade secrets, and all means by which such copies may be reproduced, be impounded and destroyed or otherwise reasonably disposed of;

H.      An order that Gstar provide copies of the source code of all versions of GstarCAD 8 and New GstarCAD – and the entire source code repositories thereof – within fourteen (14) days from entry of judgment to IronMountain, which will be appointed by the Court as the independent caretaker, and which will hold the copies of the source code until further notice;

I.      An order that Gstar provide copies of the entire source code repository of the IntelliCAD Base Software it maintains and/or has maintained;

J.      An order that Gstar send within fourteen (14) days after service of the judgment to the ITC attorneys, a written overview of the following information checked and audited by a chartered accountant:

a.      the supplier(s), maker(s), producer(s), and distributor(s) from whom the infringing matters have been obtained by Defendant, with mention of their address(es), email address(es), telephone and facsimile number(s);

b.      the quantities, numbers, prices, and delivery data of the infringing matters supplied to Defendant, all of which arranged per supplier, maker, producer, or distributor of the infringing matters, with submission of copies of relevant invoices;

c.      the buyers (insofar as known) as well as the sold quantities, numbers, prices, delivery dates, and delivery addresses of the infringing matters, all of which arranged per buyer, with submission of copies of relevant invoices and with mention of address(es), email address(es), telephone and facsimile number(s) of the buyers;

d.      the stock still under Defendant of the infringing matters with mention of the location where the infringing matters are located, as well as the quantities and numbers of the infringing matters;

e.      the turnover and profit achieved with the infringing matters as well as the various budget items deducted from the turnover to calculate the profit, provided with clear and detailed written evidence of every budget item;

K.      An order that Gstar send within fourteen (14) days after service of the judgment, a letter to all its buyers in a language comprehensible to the addressees, with exclusively the following content:

By judgment of... [date judgment] the (acting) Judge in summary proceedings of the Federal District Court for the District of Oregon decided that the Gstar products based on GstarCAD 8 and thereafter delivered to you infringes the exclusive copyrights and trade secrets of The IntelliCAD Technology Consortium. In connection herewith you must return to us within seven days from today the stock still in your possession of all Gstar products, accompanied by a written statement that there are no more (copies of the) Gstar products present at your establishment. The costs incurred by you, including forwarding costs, will be reimbursed by us. For the record we point out that keeping in stock and/or trading of the above-mentioned Gstar products infringes the exclusive copyrights and trade secrets of The IntelliCAD Technology Consortium. Yours sincerely, [name and signature].

with simultaneous forwarding of copies of these letter as well as a list of addressees with full address details to the attorneys for the ITC;

L.     An order awarding damages, together with pre-judgment and post-judgment interest, to compensate the ITC for Defendant's copyright infringement and acts of trade secret misappropriation, including actual and exemplary damages and lost profits, in an amount no less than $10,000,000.00, or in the alternative for copyright infringement, statutory damages under 17 U.S.C. § 504(c);

M.     An order that Gstar's domain registrars shut down gstarcad.net and related domains that sell infringing software;

N.     An order awarding the ITC its costs and attorney's fees; and

O.     Any and all other legal and equitable relief as may be available under law and which the court may deem proper.

DATED this 3rd day of December 2019

**HARRIS BERNE CHRISTENSEN LLP**

By:___/s/ Shawn M. Lindsay_____
    Shawn M. Lindsay, OSB #020695
    Craig R. Berne, OSB #874202
    Of Attorneys for Plaintiff