# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **THE INTELLICAD TECHNOLOGY CONSORTIUM**, | Case No. 3:19-cv-1963-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **SUZHOU GSTARSOFT CO. LTD**, | |
| Defendant. | |

Craig R. Berne and Shawn M. Lindsay, HARRIS BERNE CHRISTENSEN LLP, 15350 SW Sequoia Parkway, Suite 250, Portland, OR 97224. Of Attorneys for Plaintiff.

Julia E. Markley and Sasha A. Petrova, PERKINS COIE LLP, 1120 NW Couch Street, 10th Floor, Portland, OR 97209; Kyle Ryan Canavera, PERKINS COIE LLP, 11452 El Camino Real, Suite 300, San Diego, CA 92130. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

The IntelliCAD Technology Consortium (the "ITC") brings this lawsuit against Suzhou Gstarsoft Co. Ltd. ("Gstar"). The ITC alleges copyright infringement, trade secret misappropriation, and breach of fiduciary duty. Gstar moves to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure, arguing that the Court lacks personal jurisdiction over Gstar. Alternatively, Gstar argues that the Court should dismiss under the doctrine of *forum non conveniens*. For the reasons that follow, the Court denies Gstar's motion to dismiss.

**STANDARDS**

In a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff

bears the burden of proving that the court's exercise of jurisdiction is proper. *See*

*Schwarzenegger v. Fred Martin Motor Co*., 374 F.3d 797, 800 (9th Cir. 2004). When resolving

such a motion on written materials, rather than after an evidentiary hearing, the court need "only

inquire into whether the plaintiff's pleadings and affidavits make a prima facie showing of

personal jurisdiction." *Id*. (quotation marks omitted) (quoting *Caruth v. Int'l Psychoanalytical*

*Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). Although a plaintiff may not rest solely on the bare

allegations of its complaint, uncontroverted allegations must be taken as true. *Id*. In addition,

conflicts between the parties over statements in affidavits or declarations must be resolved in the

plaintiff's favor. *Id*. Here, neither party has requested an evidentiary hearing.

**BACKGROUND**[1]

**A.  The ITC**

Founded in 1999, the ITC is a consortium of computer aided design ("CAD") software

developers who develop and maintain the IntelliCAD software platform ("IntelliCAD"). The ITC

has its corporate headquarters in Portland, Oregon. Unlike other CAD developers, the ITC does

not sell IntelliCAD directly to end users. Instead, the ITC licenses IntelliCAD to consortium

members who pay annual fees in exchange for permission and technical guidance either (1) to

sell IntelliCAD "as is" to third-party end users or (2) to build their own proprietary products on

---

[1] Except when expressly noted, the factual background that follows is largely uncontroverted, at least for purposes of the pending motion to dismiss. It is taken from the First Amended Complaint (ECF 14), the Declaration of Meiyu Huang (ECF 16), the Declaration of Jiang Liang (ECF 17), the Declaration of Hairuo Zhang (ECF 18), the Declaration of Julie E. Markley (ECF 19), the Declaration of Shawn M. Lindsay (ECF 22-1), and the Declaration of David Lorenzo (ECF 22-2).

top of IntelliCAD. The ITC's primary source of revenue comes from licensing the IntelliCAD platform and various components to its members. The IntelliCAD platform underlies the portfolio of all design products offered by consortium members. The ITC owns more than 20 registered U.S. copyrights relating to its IntelliCAD source code. The ITC goes to great lengths to protect the IntelliCAD source code.

IntelliCAD is not conventional "open source" software. Access to the source code is allowed only to members, employees, and contractors of the ITC on an "as needed" basis. The ITC protects the source code by placing it in a secured source code repository. To secure source code access and distribution, the ITC requires members to sign restrictive covenant agreements and license back to the ITC bug fixes, modifications, and enhancements to IntelliCAD that the members develop. ITC employees, contractors, and members' employees must sign agreements that require them to protect and maintain the confidentiality of the ITC's trade secret information, including the IntelliCAD source code. Thus, the ITC provides a professional "shared development" environment only for a limited scope of members and employees/contractors, with access to proven development and testing tools. Since at least 2002, the ITC's code was primarily developed in and originated from Oregon or under direction of ITC employees from its headquarters in Oregon.

**B. Gstar**

Gstar was founded in Beijing, China in 1992. In 2001, Gstar relocated its headquarters to Suzhou. Gstar provides 2D/3D CAD software and solutions for industries involving Architecture, Engineering, and Construction; Mechanical and Manufacturing; Electrical and Electronics; Geographic Information Systems Survey and Mapping; and Civil Engineering and related sectors. Gstar provides fast, powerful and .dwg-compatible CAD software and solutions

for customers and partners in China and other countries.[2] Gstar has approximately 400

employees, including executives, programmers, developers, and sales personnel, all of whom are

in China.

Between 2015-2019, sales of licenses in China accounted for approximately 75 percent of

Gstar's total revenue. Internationally, Gstar has two basic sales models. First, Gstar's products

are available directly from Gstar's international website, www.gstarcad.net. Second, Gstar's

products also are available for purchase from approximately 50 third-party distributors and

resellers worldwide. Gstar previously partnered with four such distributors and resellers within

the United States (none were in Oregon), but its collaborations with those distributors have all

ended. From 2015 to 2019, sales within the United States accounted for approximately 0.20

percent of Gstar's total revenue. According to Gstar's records, only five of Gstar's users are

located in Oregon.

## C.  Gstar Becomes a Member of the ITC

Gstar, formerly known as "Beijing Greatstar Technology Development Co., Ltd.," joined

the ITC in 2002 as an associate member. Gstar first became a commercial member of the ITC,

and obtained a license to the IntelliCAD source code, by entering into a commercial membership

agreement with the ITC effective March 21, 2003. Gstar's commercial membership agreement

was amended and restated by the parties effective July 9, 2008, December 1, 2011, and

January 1, 2013. Under each of these commercial membership agreements, Gstar agreed to strict

provisions protecting the IntelliCAD source code and prohibiting its use in the creation of

competitive or derivative CAD platforms.

---

[2] DWG (or .dwg) (from "drawing") is "a proprietary binary file format used for storing two- and three- dimensional design data and metadata. It is the native format for several CAD packages[.]" https://en.wikipedia.org/wiki/.dwg (last visited June 5, 2020) (footnote omitted).

Beginning in 2008, Gstar had representatives on the ITC's board of directors. Xiang Lu of Gstar was on the ITC's board from October 31, 2008 through December 18, 2009 and attended four board meetings during that time, including in-person board meetings in Greece and The Netherlands.

Gstar's Meiyu Huang served on the ITC's board of directors from 2010 to 2011, 2012-2013, 2013-2014, and 2014-15. As a director of the ITC, Mr. Huang participated in most quarterly board meetings by telephone and online communication tools, like Skype. He did not attend any board meetings in person and never met with representatives of the ITC in person. He served on the ITC's board of directors until Gstar's membership in the ITC ended in 2015. Mr. Huang is one of the co-founders of Gstar and has served as its General Manager of the Overseas Business Division since February 2010.

The most recent commercial membership agreement fully executed between Gstar and the ITC is dated January 1, 2013 ("CMA"). The CMA also incorporates the ITC's "Membership Rules." Meiyu Huang was the person who signed the CMA on behalf of Gstar. Gstar would never have received access to the ITC's proprietary code and intellectual property without having entered into the CMA and its predecessors, including the incorporated Membership Rules.

**D.  Gstar Develops GstarCAD 8 and GstarCAD 2016.**

Jiang Liang is the General Manager of Gstar's Research and Development Center for Platform Software. He has held that position since 2001 and has been employed by Gstar since 1992. In September 2010, Gstar began a development project that would eventually be called "GstarCAD 8." Mr. Liang was the leader of Gstar's software development team for GstarCAD 8. According to Mr. Liang, in 2010 Gstar decided to develop a CAD product that was independent from the ITC.

In July 2013, Gstar officially released GstarCAD 8. According to Mr. Liang, the functions of GstarCAD 8 were not fully completed and stable at the time of official release. Gstar spent an additional two years on further research and development. In October 2015, Gstar released GstarCAD 2016, which was at that point largely complete and stable. Mr. Liang states that all the evidence related to Gstar's development of GstarCAD 8 is located in China, including all the source code for GstarCAD 8.

**E.  Gstar Publicly Announces GstarCAD 8; Arbitration Ensues**

When Gstar officially released and publicly announced in 2013 that it had developed GstarCAD 8, Gstar's Meiyu Huang was still on the ITC's board. According to the ITC, GstarCAD 8 competes directly with the ITC's IntelliCAD. Concerned that Gstar might have used IntelliCAD source code to create GstarCAD 8, the ITC, pursuant to the CMA and the ITC's Membership Rules, notified Gstar in August 2014 that the ITC would exercise its right to perform a source code audit of GstarCAD 8. Gstar refused to comply with that audit. Gstar also refused to pay its 2014 membership fees to the ITC. Further, the ITC contends that Gstar began soliciting ITC members to leave the consortium and use Gstar's platform instead of IntelliCAD.

The ITC sent a formal notice to Gstar in April 2015. The ITC demanded that Gstar cure its violations by: (1) retracting solicitations; (2) immediately scheduling a source code audit; and (3) affirming that Gstar had corrected any improper use of IntelliCAD, including its source code. Gstar refused to comply and stated that it intended simply to leave its membership in the ITC.

In May 2015, the ITC commenced an arbitration proceeding against Gstar by filing a statement of claim with the Arbitration Service of Portland. Gstar received notice but declined to participate in the arbitration hearing, which was conducted in September 2015 in Portland, Oregon. On September 27, 2015, the arbitrator ruled in favor of the ITC and sent his written decision to both the ITC and Gstar. In October 2015, Gstar sent an email to the arbitrator, stating

that Gstar believed that the arbitration award was improper because the ITC had presented "fake evidence" and "insufficient proof." In January 2016, the ITC filed an action in the United States District Court for the District of Oregon to confirm the arbitration award. Gstar received notice but did not appear. In February 2016, United States District Judge Michael W. Mosman confirmed the award and entered judgment in favor of the ITC. *See IntelliCAD Technology Consortium v. Suzhou Gstarsoft Co. Ltd.*, Case No. 3:16-mc-00061-MO (D. Or.).

### F.  Whether GstarCAD Is Built on IntelliCAD Intellectual Property

In its First Amended Complaint, the ITC alleges that GstarCAD 8 and its derivatives (collectively, "New GstarCAD") misappropriated significant portions of the ITC's proprietary source code. According to the ITC, the New GstarCAD is not merely an IntelliCAD "work-a-like" and does not merely share similar interfaces and commands. According to the ITC, New GstarCAD performs identically to prior versions of IntelliCAD. The ITC further contends that this duplication must be at the source code level and could not have been accomplished through coincidence or the application of similar programming logic. Also, as commercial member of the ITC, Gstar (and its developers) had access to the IntelliCAD source code.

The ITC further alleges:

> Software naturally evolves with the development of each new release and as new technologies become available. This evolution results in distinctive signatures in the source code – much like the unique patterns in the genetic code of living organisms. Just as the existence of mutations and other anomalies can demonstrate genetic lineage, the existence of "bugs," non-working system variables, and other idiosyncrasies in software code can establish programming lineage. All software code has quirks, but no two independently developed pieces of code should have identical quirks.

First Amended Complaint, ¶ 28. According to the ITC, the New GstarCAD displays precise idiosyncrasies and features that, the ITC alleges, could not have been introduced without the

wholesale copying of significant portions of the ITC's proprietary source code. *Id*. at ¶ 29. In

paragraph 29 of its First Amended Complaint, the ITC describes and identifies many of these

idiosyncrasies and features.

In response, Gstar's Mr. Liang asserts that "Gstar decided to undertake developing its

own CAD platform from the ground up, not dependent on any ITC source code." ECF 17 at ¶ 3.

Mr. Liang, however, does not attempt to explain how the many IntelliCAD idiosyncrasies and

features identified by the ITC in its First Amended Complaint came to appear in the New

GstarCAD. As the case progresses to the merits, there may or may not be innocent explanations.

But first, the question of personal jurisdiction in Oregon must be resolved.

## G.  The 2013 Commercial Membership Agreement ("CMA")

The 2013 CMA contains the follow provisions, among others:

Article 5 of the CMA is titled, "Termination and Suspension of Commercial Membership

or Services; Dissolution; Merger." Section 5.4.2 states, in relevant part:

> **5.4.2 Survival and Inspection.** Sections 2.3, 3.1, 5.4, 6, 7, 8,
> and 9 . . . will survive any termination of this Agreement.

ECF 14-1 at 9 (CMA, § 5.4.2).

Article 9 of the CMA is titled, "General Provisions." Section 9.5 is titled, "Dispute

Resolution." In its entirety, Section 9.5 states:

> **9.5 Dispute Resolution.** All disputes, controversies, claims, and
> defenses arising out of, relating to, or involving this Agreement,
> whether involving theories of tort, contract, or violation of
> statutory laws ("Claims") are subject to the following provisions:
>
> **9.5.1 Arbitration.** Except as to actions, suits, or proceedings
> commenced or maintained by persons not parties hereto, any party
> may elect to have any Claim be determined by binding arbitration.
> The election shall be made by written notice. Unless the parties
> otherwise agree in writing, the arbitration shall be conducted in
> Portland, Oregon before a single arbitrator and in accordance with
> the commercial arbitration rules of the Arbitration Service of

Portland, Inc. If the parties are unable to agree on an arbitrator within 14 days of an election to arbitrate, the arbitrator shall be appointed in accordance with the procedures set forth in ORS Chapter 36. The arbitrator shall issue an award within 30 days of conclusion of the hearing. The award of the arbitrator shall be final and binding. Judgment on any arbitration award may be entered in any court with jurisdiction.

**9.5.2 Provisional Remedies.** If a party elects to have any Claims determined by arbitration, any provisional remedy issued prior thereto may remain in effect until such time as an arbitrator is selected or appointed and has assumed to determine the Claim. Thereafter the arbitrator may issue, continue, or terminate provisional relief or may permit a party to pursue provisional relief in court.

**9.5.3 Applicable Law; Jurisdiction and Venue.** This Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the State of Oregon without reference to its choice of law rules. All actions or suits by a party shall be brought and maintained in Portland, Oregon. Each party consents to personal jurisdiction in Oregon and waives any right to seek a change of venue.

**9.5.4 Costs and Attorney Fees.** The prevailing party in a judicial action, suit or arbitration proceeding shall be awarded all reasonable costs, attorney's fees and expenses incurred in connection with the proceeding and on any appeal except that the costs and fees of the arbitrator shall be shared equally.

ECF 14-1 at 12-13 (CMA, § 9.5, including §§ 9.5.1 through 9.5.4).

## DISCUSSION

**A. Personal Jurisdiction**

**1. Legal framework**

Personal jurisdiction may rest entirely upon consent. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985). This is consistent with due process, even if a defendant does not otherwise have minimum contacts with the forum state. *Id.* As the United States Supreme Court has explained:

> We have noted that, because the personal jurisdiction requirement
> is a waivable right, there are a variety of legal arrangements by
> which a litigant may give express or implied consent to the
> personal jurisdiction of the court. . . . For example, particularly in
> the commercial context, parties frequently stipulate in advance to
> submit their controversies for resolution within a particular
> jurisdiction. . . . Where such forum-selection provisions have been
> obtained through freely negotiated agreements and are not
> unreasonable and unjust, . . . their enforcement does not offend due
> process.

*Id.* (citations and quotation marks omitted); *see also Carnival Cruise Lines, Inc. v. Shute*, 499

U.S. 585, 589 (1991) ("Because we find the forum-selection clause to be dispositive of this

question, we need not consider petitioner's constitutional argument as to personal jurisdiction.").

The question thus turns upon the scope and enforceability of a consent-to-jurisdiction or,

as in this case, a forum-selection clause. In federal question cases, the scope and enforceability of

a forum-selection clause is controlled by federal law. *See Carnival Cruise Lines*, 499 U.S. at 590

("this is a case in admiralty, and federal law governs the enforceability of the forum-selection

clause we scrutinize"). Here, the ITC alleges a violation of federal copyright law, as well as two

state claims.

But even in diversity cases, the rule in the Ninth Circuit is that federal law controls the

enforcement of a forum-selection clause. *See Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858

F.2d 509, 513 (9th Cir. 1988) ("the federal procedural issues raised by forum selection clauses

significantly outweigh the state interests, and the federal rule announced in *The Bremen* controls

enforcement of forum clauses in diversity cases"). In *M/S Bremen v. Zapata Off-Shore Co.* ("*The

Bremen*"), 407 U.S. 1, 15 (1972), the Supreme Court held that a forum-selection clause should be

enforced unless "unreasonable and unjust" or "the clause was invalid for such reasons as fraud or

overreaching." *See also Manetti-Farrow*, 858 F.2d at 514 ("Forum selection clauses are *prima

facie* valid, and are enforceable absent a strong showing by the party opposing the clause that

enforcement would be unreasonable or unjust, or that the clause [is] invalid for such reasons as fraud or overreaching) (citing *The Bremen*) (citation and quotation marks omitted) (brackets in original). Here, there is no argument, let alone any strong showing, that enforcement of the parties' forum-selection clause would be unreasonable or unjust or that the clause is invalid due to fraud or overreaching.

The only real dispute among the parties at this stage of the litigation concerns the construction and scope of the forum-selection clause in § 9.5.3 of the CMA. In 1988, the Ninth Circuit stated that "forum selection clauses can be equally applicable to contractual and tort causes of action." *Manetti-Farrow*, 858 F.2d at 514. In the specific context the clause at issue in that case, the Ninth Circuit noted that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." *Id*.[3]

More recently, the Ninth Circuit decided *Yei A. Sun v. Advanced China Healthcare, Inc*., 901 F.3d 1081 (9th Cir. 2018). In that case, the plaintiffs had invested $2.8 million in the defendant, Advanced China Healthcare, Inc. The parties entered into two Share Purchase Agreements, "each of which contained a forum-selection clause that required any disputes 'arising out of or related to' the agreements to be adjudicated in California state court." *Id*. at 1084. Notwithstanding the forum-selection clause, the plaintiffs in *Advanced China Healthcare* sued the defendant federal court in Washington, alleging violations of the Washington State Securities Act ("WSSA"). The federal district court conditionally granted the defendant's motion to dismiss for *forum non conveniens*. The plaintiffs appealed, and the Ninth

---

[3] In *Manetti-Farrow*, the parties' contract included a clause that designated Florence, Italy as the forum for resolution of any controversy "regarding interpretation or fulfillment" of the contract. *Manetti-Farrow*, 858 F.2d at 510. That case, however, involved a narrow forum-selection clause.

Circuit affirmed. The plaintiffs' first argument was that, as a matter of contract construction, the forum-selection clause did not apply to that action.[4]

As the Ninth Circuit explained, "We apply federal contract law to interpret the scope of a forum-selection clause even in diversity actions, such as this one." *Id*. at 1086, citing *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (per curiam), and *Manetti-Farrow*, 858 F.2d at 512-13. The Ninth Circuit added: "In interpreting a forum-selection clause under federal law, we look for guidance to general principles for interpreting contracts." *Advanced China Healthcare*, 901 F.3d at 1086. The Ninth Circuit clarified and expanded upon its explanation from *Manetti-Farrow*:

> By its terms, the forum-selection clause here applies to "any disputes arising out of or related to" the Share Purchase Agreements. Accordingly, we must determine whether the Suns' claim that Kao violated the WSSA constitutes such a dispute. We have held that forum-selection clauses covering disputes "arising out of" a particular agreement apply only to disputes "relating to the interpretation and performance of the contract itself." . . . By contrast, forum-selection clauses covering disputes "relating to" a particular agreement *apply to any disputes that reference the agreement or have some "logical or causal connection" to the agreement. . . . The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract.*
>
> Applying this framework, the Share Purchase Agreements' forum-selection clause covers the present suit. Because the clause covers "any disputes . . . related to this Agreement," *it applies to any dispute that has some logical or causal connection to the parties' agreement*. Here, the Suns' claim that Kao engaged in various fraudulent practices to induce them to invest $2.8 million in Advanced China Healthcare relates to the Share Purchase Agreements because the Suns invested pursuant to those agreements. . . . Indeed, the Suns' complaint itself alleges that they

---

[4] The plaintiffs' second argument was based on Washington public policy and is not relevant to the pending dispute.

> executed the Share Purchase Agreements "in reasonable and
> justifiable reliance on the representations of Kao."

*Advanced China Healthcare*, 901 F.3d at 1086 (citations omitted) (emphasis added).

### 2.  Application

Here, the relevant forum-selection clause reads as follows:

> All actions or suits by a party shall be brought and maintained in
> Portland, Oregon. Each party consents to personal jurisdiction in
> Oregon and waives any right to seek a change of venue.

ECF 14-1 at 13 (CMA, § 9.5.3).[5] Gstar, however, argues that this "clause applies only to actions

for breach of contract claims and actions whose resolution relates to the interpretation of the

CMA." ECF 15 at 25 (internal page 18). Gstar attempts to support this conclusion with two

premises. First, Gstar notes that § 9.5 of the CMA states:

> All disputes, controversies, claims, and defenses arising out of,
> relating to, or involving this Agreement, whether involving
> theories of tort, contract, or violation of statutory laws ("Claims")
> are subject to the following provisions:

ECF 14-1 at 12 (CMA, § 9.5). Second, Gstar notes that § 9.5.3 does not use the defined term

"Claims" and begins with the sentence, "This Agreement will be interpreted, construed and

enforced in all respects in accordance with the laws of the State of Oregon without reference to

its choice of law rules." ECF 14-1 at 13 (CMA, § 9.5.3). Although Gstar's two premises are

factually correct, its conclusion does not logically follow. This is true for several reasons.

First, Gstar fails to note the title or caption of § 9.5.3, which reads: "Applicable Law;

Jurisdiction and Venue." The two phrases in the caption are "Applicable Law" and "Jurisdiction

and Venue," and they are separated by a semicolon. This reveals a separation, or distinction, that

---

[5] There is no dispute that this forum-selection clause survives termination of the CMA. *See* CMA, § 5.4.2.

is even greater than is expressed by a comma.[6] The two concepts are related, but distinct. The

first sentence of § 9.5.3 concerns "applicable law." The second and third sentences concern

"jurisdiction" and "venue." Thus, just because the first sentence provides that the CMA will be

interpreted, construed, and enforced in accordance with Oregon law, that does not constrain or

limit the construction or application of the next two sentences.

Second, Gstar would construe both the second and third sentences of § 9.5.3 to read as if

they stated the following, with the underlined words added by Gstar:

> All actions or suits by a party that allege breach of this Agreement
> shall be brought and maintained in Portland, Oregon. Each party
> consents to personal jurisdiction in Oregon and waives any right to
> seek a change of venue for actions or suits that allege breach of
> this Agreement.

This, however, violates a fundamental rule of contract construction that prohibits inserting what

has been omitted (or omitting what has been inserted). *See, e.g.*, Or. Rev. Stat. § 42.230 ("In the

construction of an instrument, the office of the judge is simply to ascertain and declare what is,

in terms or in substance, contained therein, not to insert what has been omitted, or to omit what

has been inserted; and where there are several provisions or particulars, such construction is, if

possible, to be adopted as will give effect to all."); *see also* Antonin Scalia and Bryan A. Garner,

*Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing Canon 8, the Omitted-

Case Canon, and stating "Nothing is to be added to what the text states or reasonably implies

(*casus omissus pro omisso habenendus est*)").

Third, Gstar, in the alternative, would construe both the second and third sentences of

§ 9.5.3 to read as if they stated the following, with the underlined words added by Gstar:

---

[6] *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 357
(2016).

> All actions or suits by a party <u>that arise out of, relate to, or involve this Agreement</u> shall be brought and maintained in Portland, Oregon. Each party consents to personal jurisdiction in Oregon and waives any right to seek a change of venue <u>for actions or suits that arise out of, relate to, or involve this Agreement</u>.

Not only does this violate the fundamental rule of contract construction that prohibits inserting what has been omitted, as discussed above, it also fails to account for the Ninth Circuit's decision in *Advanced China Healthcare*. In that case, the Ninth Circuit explained that a dispute can "relate" to an agreement so long as the dispute references the agreement or has some "logical or causal connection" to the agreement. *Advanced China Healthcare*, 901 F.3d at 1086. As the Ninth Circuit further stated in that case: "The dispute need not grow out of the contract or *require interpretation of the contract in order to relate to the contract*." *Id.* (emphasis added).

That test is satisfied here. The First Amended Complaint contains numerous references to the CMA. Also, the ITC alleges that but for the CMA, Gstar never would have had access to the IntelliCAD source code at issue in this lawsuit. Further, Gstar's alleged fiduciary duties arise from the service of its officers on the ITC's board of directors, which also would never have occurred but for Gstar entering into the CMA. Thus, any requirement of a logical or causal connection between the claims in this case and the CMA is satisfied here. This confirms that the lawsuit "relates" to the CMA.

Fourth, Gstar, in the further alternative, would construe both the second and third sentences of § 9.5.3 to read as if they stated the following, with the underlined words added by Gstar:

> All actions or suits by a party <u>that arise out of this Agreement</u> shall be brought and maintained in Portland, Oregon. Each party consents to personal jurisdiction in Oregon and waives any right to seek a change of venue <u>for actions or suits that arise out of this Agreement</u>.

As discussed above, this violates the fundamental rule of contract construction that prohibits inserting what has been omitted. Further, there is no principled reason to insert only "arise out out" but not also then insert "or relate to." This is especially true considering the broad text contained in § 9.5. Further, the fact that § 9.5.3 begins with the sentence, "This Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the State of Oregon without reference to its choice of law rules" does not support adding only "arise out of" without also including "or relate to." Nothing supports such a reading other than Gstar's own *ipse dixit*.

Fifth, Gstar argues that because § 9.5.3 does not use the term "Claims," which was defined in § 9.5, while § 9.5.1 and § 9.5.2 both use that term, then § 9.5.3 should not be interpreted as broadly as the word "Claims" and must be limited to actions alleging breach of contract or claims that require the contract to be interpreted. Again, Gstar's conclusion does not logically follow. Moreover, certain "disputes" or "controversies" may arise between the parties that are not (or not yet) cognizable in court through an action or suit yet could be resolved by binding arbitration. One example is that the parties may disagree on the precise protocol to be used for a source code audit, even if they agree that an audit is required under the CMA. (Indeed, that dispute appears to have occurred in this case.) A binding arbitration might be an appropriate vehicle to resolve that dispute, even if a legal action or suit might not be available because both parties agree that the CMA requires an audit but does not specify its protocol. Indeed, the parties may prefer to have such a dispute resolved by binding arbitration rather than by public trial. Further, § 9.5.1 allows for the possibility of an arbitration to be conducted at a location other that Portland, Oregon, whereas § 9.5.3 states more definitively, "All actions or suits by a party shall be brought and maintained in Portland, Oregon." Thus, it may be entirely appropriate for the

parties to use the term "Claims" when they wanted to include all disputes and controversies that might be resolved by binding arbitration but not yet rise to the level of a cognizable legal action or suit. This could explain why § 9.5.3 does not use the word "Claims." But, in the end, it does not matter. The natural and plain interpretation of the text of § 9.5.3 is clear, even though it does not use the word "Claims," as the Court next addresses.

Sixth, Gstar argues that by not using the word "Claims," the last two sentences in § 9.5.3 are rendered ambiguous and that any ambiguity must be resolved against the drafter, the ITC. The flaw in this argument is that there is absolutely nothing ambiguous about either the sentence, "All actions or suits by a party shall be brought and maintained in Portland, Oregon" or the sentence, "Each party consents to personal jurisdiction in Oregon and waives any right to seek a change of venue." Both sentences are plain and unambiguous. There may be a legal reason to restrict the scope of these provisions to disputes that have some "logical or causal connection" to the agreement, as the Ninth Circuit discusses in *Advanced China Healthcare*, 901 F.3d at 1086. But there is no textual ambiguity.

Seventh, and finally, all four subsections of § 9.5 are introduced by the prefatory text of that section. That text reads: "All disputes, controversies, claims, and defenses arising out of, relating to, or involving this Agreement, whether involving theories of tort, contract, or violation of statutory laws ("Claims") *are subject to the following provisions*:" (emphasis added). Section 9.5.3 is one of the "following provisions." Therefore, all disputes, controversies, claims, and defenses "arising out of, relating to, or involving this Agreement, whether involving theories of tort, contract, or violation of statutory laws" are subject to the forum-selection clause (and venue waiver) contained in § 9.5.3. It is not a reasonable construction of § 9.5.3 to limit that

provsion to claims alleging breach of contract or even, as discussed previously, to claims "arising out of" the parties' contract.[7]

_____

[7] At oral argument, Gstar asserted that this lawsuit is analogous to three district court decisions, *Kiley v. Medfirst Consulting Healthcare Staffing, LLC*, 2017 WL 11434180 (D. Or. Oct. 13, 2017); *Shapiro v. American Bank*, 2013 WL 4095246 (D. Or. Aug. 8, 2013); and *Hebe v. Seagrave Fire Apparatus, LLC*, 2007 WL 1541741 (D. Or. May 18, 2007). These cases, however, were all decided before *Advanced China Healthcare* and thus do not aid the analysis here. In *Kiley*, the forum-selection clause stated: "Each party hereby irrevocably submits to the exclusive jurisdiction of the courts of Alabama, for the purposes of any proceedings *arising out of this Agreement*." *Kiley*, 2017 WL 11434180 at *2 (emphasis added). The forum-selection clause in *Kiley* is more restrictive than what is found in either § 9.5.3 or even § 9.5 of the CWA. *See generally Advanced China Healthcare*, 901 F.3d at 1086.

In *Shapiro*, an employee sued his employer in Oregon, alleging violation of Oregon's whistleblower statute and common law wrongful discharge. The relevant clause in Shapiro's employment agreement stated: "Employee agrees that he or she will be subject to the jurisdiction of and appear in Maryland federal and state courts in any other jurisdiction." *Shapiro*, 2013 WL 4095246 at *1. American Bank challenged venue under Rule 12(b)(3) and alternatively moved to transfer for improper venue under 28 U.S.C. § 1406(a). *Id.* The district court denied American Bank's motion to dismiss or transfer for improper venue. The parties' employment agreement merely consented to jurisdiction in Maryland; it did not require that all actions be brought there. There also is *dicta* in that case, stating that in *Manetti-Farrow* whether a forum selection clause applies to tort claims depends on whether resolution of the tort claims relates to interpretation of the contract. *Shapiro*, 2013 WL 4095246 at *7. Even if such a broad statement were a correct reading of *Manetti-Farrow*, which it does not appear to be, *see* n.3, *supra*, such a proposition would not survive *Advanced China Healthcare*, 901 F.3d at 1086 ("The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract.").

Finally, in *Hebe*, an employee sued in Oregon for unpaid wages and other compensation. In the alternative, he alleged breach of contract. Hebe and a group of other investors signed a limited partnership agreement ("LPA") in connection with their investment. The LPA contained a forum-selection clause that stated that any action by one or more partners against the partnership, its general partner, or any "Affiliate" that "arisies under or in any way related to" the LPA, the sale of partnership interests, or actions taken by the general partner or its Affiliates "may be brought only in" Delaware. *Hebe*, 2007 WL 1541741 at *1. Hebe's employment agreement, however, was with Seagrave, which was *not* an Affiliate under the LPA, and Hebe's employment agreement did *not* contain any forum-selection clause. *Id*. at *2. Seagrave moved to dismiss for improper venue, and the district court denied that motion. *Id*. at *1. In the magistrate's findings and recommendation, the magistrate judge, in describing legal standards, stated in *dicta* that a forum-selection clause "applies to a claim if its litigation requires interpretation of the contract containing the clause." *Id*. at 2, citing *Manetti-Farrow*. As with *Shapiro*, discussed above, even if such a broad statement were a correct reading of *Manetti-Farrow*, it would not survive *Advanced China Healthcare*.

**B.  Venue and *Forum Non Conveniens***

As an alternative argument, Gstar asserts that the Court should dismiss this case under the doctrine of *forum non conveniens*.[8] Gstar argues that China offers an adequate alternative forum, that private interests heavily favor dismissal, and that the public interest factors are neutral. Gtar's analysis, however, overlooks the existence of a valid and enforceable forum-selection clause.

As discussed in the previous section, § 9.5.3 of the CMA states in relevant part:

> All actions or suits by a party shall be brought and maintained in Portland, Oregon. Each party consents to personal jurisdiction in Oregon and *waives any right to seek a change of venue*.

ECF 14-1 at 13 (CMA, § 9.5.3) (emphasis added). As discussed in the previous section, this forum-selection clause is unambiguous and enforceable.[9]

As the Supreme Court has stated, in "the typical case not involving a forum-selection clause," a district court considering a *forum non conveniens* motion "must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Id*. at 63 (citation omitted). The Supreme Court continues:

---

[8] There is no dispute that venue is appropriate in this district under 28 U.S.C. § 1391(b). First, the "property" at issue, IntelliCAD and its source code, is the intellectual property of the ITC. The ITC is headquartered in Oregon, and IntelliCAD was created and is maintained in Oregon. This satisfies § 1391(b)(2). Further, venue also is appropriate in this district under § 1391(b)(3) because this Court has personal jurisdiction over Gstar and there is no district in the United States in which this action may otherwise be brought.

[9] There also is no dispute that it survives termination of the CMA. *See* n.5, *supra*.

> The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system. . . . For that reason, . . . a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.

*Id.* (citation and quotation marks omitted) (brackets in original). Further,

> When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum.

*Id.* at 64.[10]

That leaves only the public-interest factors and "the practical result is that forum-selection clauses should control except in unusual cases." *Id.* This is not an unusual case. The public interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Advanced China Healthcare*, 901 F.3d at 1088 (quoting *Atl. Marine*, 571 U.S. at 62 n.6) (quotation marks omitted).

Finally, the Supreme Court in *Atlantic Marine* explained the powerful rationale for enforcing a valid forum-selection clause.

> When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations. A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; *it*

---

[10] The Ninth Circuit elaborated on this point in *Advanced China Healthcare*. When there is a valid and enforceable forum-selection clause, "a court must deem all factors relating to the private interests of the parties (such as the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive) as weighing entirely in favor of the preselected forum." *Advanced China Healthcare*, 901 F.3d at 1086.

> *may, in fact, have been a critical factor in their agreement to do*
> *business together in the first place*. In all but the most unusual
> cases, therefore, "the interest of justice" is served by holding
> parties to their bargain.

*Atl. Marine*, at 66 (emphasis added).

## CONCLUSION

Defendant Suzhou Gstarsoft Co. Ltd. contractually agreed and consented to personal

jurisdiction in this Court and waived any right to seek a change of venue. These actions of

agreement, consent, and waiver are all valid and enforceable. Accordingly, Defendant's Motion

to Dismiss (ECF 15) is DENIED.

**IT IS SO ORDERED.**

DATED this 8th day of June, 2020.

_/s/ Michael H. Simon_____
Michael H. Simon
United States District Judge