**Julia E. Markley**, OSB No. 000791
JMarkley@perkinscoie.com
**Sasha Petrova**, OSB No. 154008
SPetrova@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

**W. Matthew Pierce** (*pro hac vice pending*)
WPierce@perkinscoie.com
**PERKINS COIE LLP**
1900 16th St., Suite 1400
Denver, CO 80202-5258
Telephone: 303.291.2300
Facsimile: 303.291.2400

**Kyle Ryan Canavera** (*admitted pro hac vice*)
KCanavera@perkinscoie.com
**PERKINS COIE LLP**
11452 El Camino Real, Suite 300
San Diego, CA 92130-2080
Telephone: 858.720.5700
Facsimile: 858.720.5799

*Attorneys for Defendant*
*Suzhou Gstarsoft Co., Ltd.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

THE INTELLICAD TECHNOLOGY CONSORTIUM,

Plaintiff,

v.

SUZHOU GSTARSOFT CO. LTD.,

Defendant.

No. 3:19-cv-01963-SI

**GSTAR'S RESPONSE TO ITC'S BRIEF REGARDING PROPOSED PROTECTIVE ORDER**

## TABLE OF CONTENTS


**Page**

I. THIS COURT'S PRIOR ORDER OF AN AUDIT HAS NO BEARING ON THE ACTUAL PROTECTIVE ORDER DISPUTES BETWEEN THE PARTIES ................. 1

II. ITC'S ARGUMENT THAT ITS PRESIDENT MUST SEE GSTAR'S SOURCE CODE REVISION HISTORY HAS NO BASIS IN LAW OR FACT, SPO §§ 2.8, 8(C)(1)........ 2

III. THE COURT SHOULD NOT DECIDE THE FACTUAL QUESTION OF WHETHER MR. LINDSAY SHOULD BE TREATED AS OUTSIDE COUNSEL UNTIL AFTER OPPORTUNITY FOR FACTUAL DISCOVERY, SPO § 2.11 ........ 4

IV. ITC'S BUILD PROPOSAL IS NOT TECHNOLOGICALLY FEASIBLE, SPO § 8(C)(2)........ 5

V. COMMERCIALLY AVAILABLE TOOLS ARE FULLY CAPABLE AND SECURE, SPO § 8(C)(5)(C)........ 6

VI. ITC'S ARGUMENT FOR ELECTRONIC PRODUCTION IS PREMISED ON REQUESTING AN UNREASONABLE AMOUNT OF SOURCE CODE PRODUCTION, SPO §§ 8(C)(6), 8(D)........ 9

VII. ITC WAIVED ANY ARGUMENT THAT ALL REVISION HISTORY SHOULD BE PRODUCED TO THE SOURCE CODE COMPUTER, SPO § 8(C)(1)........ 10




**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

# TABLE OF AUTHORITIES

**Page**

**CASES**


*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
11-CV-01846-LHK, 2012 WL 10817203 (N.D. Cal. Jan. 30, 2012) ....................8

*Brown Bag Software v. Symantec Corp.*,
960 F.2d 1465 (9th Cir. 1992) ....................3

*FastVDO LLC v. AT&T Mobility LLC*,
16-CV-385-H-WVG, 2016 WL 9049521 (S.D. Cal. July 25, 2016) ....................8

*Guitar Apprentice, Inc. v. Ubisoft, Inc.*,
213CV02903JPMTMP, 2014 WL 12769613 (W.D. Tenn. Nov. 6, 2014) ....................9

*Intel Corp. v. VIA Techs., Inc.*,
198 F.R.D. 525 (N.D. Cal. 2000) ....................4, 5

*Memory Integrity, LLC v. Intel Corp*.,
No. 3:15-cv-00262-SI (D. Or. June 3, 2015) ....................9

*Protegrity Corp. v. Epicor Software Corp.*,
3:13 CV 1781 JBA, 2014 WL 3864899 (D. Conn. Aug. 6, 2014) ....................10

*Uniloc 2017 LLC v. Microsoft Corp.*,
818CV02053AGJDEX, 2019 WL 451345 (C.D. Cal. Feb. 5, 2019) ....................9

*Unwired Planet LLC v. Apple Inc.*,
3:12-CV-00505-RCJ, 2013 WL 1501489 (D. Nev. Apr. 11, 2013) ....................9


**OTHER AUTHORITIES**


Code Match, *available at* http://safe-corp.com/products_codematch.htm ....................7

Code Suite, *available at* http://safe-corp.com/products_codesuite.htm ....................7




**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

None of the arguments in IntelliCAD Technology Consortium's ("ITC's") Brief Regarding Protective Order (Dkt. No. 41) ("ITC Opening Brief") are well taken. As detailed below, ITC's arguments fail either because they reduce the protection of source code that the Northern District of California's Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets ("Model Order") provides—which protections are particularly important as ITC seeks to inspect the source code of its competitor, Defendant Suzhou Gstarsoft Co., Ltd. ("Gstar")—or they are founded on Model Order language or Gstar's language that do not actually give rise to the concerns ITC expresses. Accordingly, Gstar asks the Court to adopt its proposed language in the parties' proposed Stipulated Protective Order ("Dkt. No. 42-1) ("SPO"), submitted as an exhibit to Gstar's Brief in Support of Gstar's Proposed Protective Order Language (Dkt. No. 42) ("Gstar Opening Brief").

## I. THIS COURT'S PRIOR ORDER OF AN AUDIT HAS NO BEARING ON THE ACTUAL PROTECTIVE ORDER DISPUTES BETWEEN THE PARTIES

The ITC relies on a prior order of this Court as somehow bearing on this SPO dispute. *See* Case No. 3:16-mc-00061-MO, Dkt. No. 5 ("Order Confirming Arbitration"). But ITC does not explain how the Order Confirming Arbitration impacts any of the SPO disputes, and in fact, it does not.

The Order Confirming Arbitration does not provide any guidance on the six specific SPO disputes between the parties. As to the source code audit, the Order Confirming Arbitration states in its entirety: "Defendant Suzhou Gstarsoft Co. Ltd. ('Gstar') is required to undergo an audit of its CAD software platform by the ITC." Order Confirming Arbitration at 1. The Order Confirming Arbitration provides no detail on: level of protection of revision histories (item II below); access to information by attorneys involved in competitive decision-making (item III below); building of the source code (item IV below); installation of unidentified software on the Source Code Computer (item V below); providing electronic copies of Gstar's source code (item VI below); or scope of production of revision histories (item VII below). This is



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

unsurprising, since none of these items was actually litigated in the prior arbitration or in the prior proceeding to confirm the arbitration award in this Court. Accordingly, neither the Order Confirming Arbitration, nor the arbitration award and commercial membership agreement on which it was based, have any bearing on the current SPO disputes.

Beyond not bearing on the issues in dispute, the Order Confirming Arbitration does not change the fact that ITC and Gstar have since become direct competitors in the CAD market, with all of the standard risks of competitive harm to a litigant if its source code information is improperly disclosed during the course of litigation. Those are the same risks that motivate the Model Order and the case law cited in the Gstar Opening Brief. For those reasons, and the additional reasons discussed below, Gstar urges the Court to adopt its proposed SPO language on the six disputes between the parties.

## II. ITC'S ARGUMENT THAT ITS PRESIDENT MUST SEE GSTAR'S SOURCE CODE REVISION HISTORY HAS NO BASIS IN LAW OR FACT, SPO §§ 2.8, 8(c)(1)

As the Gstar Opening Brief explained, the Model Order treats source code revision history as Highly Confidential – Source Code. This reflects the common recognition that source code revision history, like source code itself, often contains trade secrets that need protecting. ITC's sole argument for abandoning the Model Order's approach is that it needs ITC's President to see Gstar's revision history in order to prove ITC's case. This argument fails on the facts and contradicts precedent on protection of information during litigation.

ITC seeks to lower the protection on Gstar's source code revision history because supposedly "[n]o one outside of David Lorenzo, the President of the ITC, has the knowledge to be able to look at Gstar's source code repository and decide which revisions are most likely to contain proof of copying by Gstar." (ITC Opening Br. at 4.) ITC then describes the pattern that Mr. Lorenzo would look for in Gstar's revision history: a "critical revision . . . only worked on by one or two developers over a matter of weeks," which would contradict Gstar's explanation of



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

the large effort involved in developing its product. *Id.* at 5. But ITC does not explain why its President is the only person capable of counting the number of developers adding source code to the repository. Namely, why is ITC's ***source code analysis expert*** incapable of performing this analysis as well as, or perhaps even better than, ITC's President? Mr. Lorenzo can provide any useful information to ITC's expert prior to her review of the source code repository, and she presumably has the technical skills to conduct that analysis.

ITC's rationale also directly contradicts trade secret protection law. ITC reasons that the Court should depart from the standard that revision history is protected at the same level as source code because ITC's President is uniquely positioned to analyze Gstar's source code repository. But it is a fundamental principle that someone involved in competitive decision-making for a party should not have access to a competitor's trade secret information in litigation. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). ITC's President is undoubtedly involved in competitive decision-making. Gstar could not locate any case, and ITC cites none, suggesting that a party's need to prove its case outweighs the need to prevent disclosure of sensitive information to a competitor's business executives during litigation.

Finally, ITC suggests that Gstar's revision history will not actually reveal sensitive information. But the suggestion is speculative and minimizes the significance of the details in the revision history. ITC notes that revision history can include "comments that were inserted about the revision" (ITC Opening Br. at 4), but omits that the best practice in the industry is for those comments to describe what change the programmer made and why. Beyond the comments, a revision history can indicate who Gstar's key programmers are, how Gstar organized its software development process, and the structure of Gstar's source code (which is indicated in part by the file names and file paths). These are the sort of details that no entity would share with a competitor, which Gstar has never shared publicly, and which the Model Order by default treats as being as sensitive as the source code itself.



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

### III. THE COURT SHOULD NOT DECIDE THE FACTUAL QUESTION OF WHETHER MR. LINDSAY SHOULD BE TREATED AS OUTSIDE COUNSEL UNTIL AFTER OPPORTUNITY FOR FACTUAL DISCOVERY, SPO § 2.11

Regarding "Outside Counsel of Record," the parties seem to agree on the basic legal principles. ITC does not dispute that counsel treated as "Outside Counsel of Record" under the SPO, with access to Highly Confidential – Source Code, cannot have been involved in competitive decision-making, as embodied by the agreed language in SPO § 2.11.

What the parties do not agree on are the facts, and when those facts should be adjudged. ITC asks the Court to rule now on the factual matter of whether Mr. Lindsay is involved in competitive decision-making, before the Court has taken evidence on the matter and before Gstar has had an opportunity to seek discovery on the matter. ITC laments that refusing to rule on this matter now "kicks the can down the road." (ITC Opening Br. at 5.) However, neither Gstar nor the Court has a sufficient grasp of the relevant facts. Gstar urges the Court to resist this effort at a premature decision on this issue.

Furthermore, ITC's complaint that deferring this issue will result in "presumably slowing down and interfering with later trial preparation" (ITC Opening Br. at 5), rings hollow. Any complication on this issue was wholly caused by ITC's decision to use its "Outside General Counsel" as its litigation counsel. And courts have rejected ITC's rationale before:

> In *Brown Bag*, a Party's contention that in-house counsel needed access to confidential information to manage the case was held to be insufficient to overcome the risk of inadvertent disclosure, even where outside counsel had withdrawn from the litigation. The protective order must actually prejudice presentation of the moving party's case, not merely increase the difficulty of managing the litigation.

*Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 528 (N.D. Cal. 2000) (citations omitted). In light of ITC's representation by highly competent counsel in the form of Mr. Berne, ITC's concerns about "presumably slowing down and interfering with later trial preparation" and "Mr. Lindsay's ability to effectively assist his law partner and co-counsel" seem to be complaints as to increased difficulty in managing litigation that are not on par with the protection of a party's trade secrets.



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

ITC is free to have Mr. Lindsay coordinate with Mr. Berne while only Mr. Berne has access to the Highly Confidential material, and "[r]equiring a party to rely on its competent outside counsel does not create an undue and unnecessary burden." *Id.* at 529 (citation and internal quotation marks omitted).

Finally, ITC has already brought upon itself a complication with trial preparation in light of its use of Mr. Lindsay as litigation counsel. Namely, ITC stated the following in in briefing on the motion to dismiss: "The ITC's two most important witnesses, Dave Lorenzo and Shawn Lindsay, both reside and work in Oregon." (Dkt. No. 22 at 10–11.) And the rules of professional conduct bar an attorney from acting both as witness and advocate at the same trial, absent one of various exceptions that are not present here. *See* Oregon Rules of Rules of Professional Conduct 3.7(a) ("A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a witness on behalf of the lawyer's client unless . . . [.]").

As such, ITC's request that the Court help streamline its legal case management is premature, unsupported by caselaw, and not even followed by ITC itself.

## IV. ITC'S BUILD PROPOSAL IS NOT TECHNOLOGICALLY FEASIBLE, SPO § 8(c)(2)

A recap of the agreed-upon process is necessary to guide the Court through the parties' dispute about the "build" issue. First, there will be a ***remote*** selection process, during which ITC will view the Gstar repository over a video conference and select source code for further review. SPO § 8(c)(1). Gstar will then securely transport the selected source code from Gstar's repository computer in China to Gstar's counsel's office in Portland, where the selected source code will be installed on the Source Code Computer, SPO § 8(c)(4). ITC's expert will come to Gstar's counsel's Oregon office to perform a ***local*** source code review of the selected revisions. SPO § 8(c)(5). At that stage, Gstar proposes that ITC is free to attempt to "build" the source code if it desires. SPO § 8(c)(2).



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

ITC misstates Gstar's position on the process of building the selected revisions into the executable program. Although ITC is correct that "Gstar believes that ITC should be the party to build the executable program," ITC is wrong when it states that Gstar believes "that ITC should do this remotely from Oregon to a computer located in Beijing, China." (ITC Opening Br. at 7.) As Gstar explained in its opening brief, the source code build process creates the executable program on the same computer where the source code is located. Gstar has never proposed building the source code starting on one computer and ending on another, and it is not aware of any technology used by Gstar that would be capable of performing that activity.

Thus, because ITC's proposal is not technologically feasible, because it does not allow Gstar time to securely transfer its source code to the United States, such as on an encrypted hard disk, and because ITC's request is incompatible with the obligations of the Federal Rules of Civil Procedure (*see* Gstar Opening Br. at 6–8), Gstar requests the Court adopt its SPO language.

## V. COMMERCIALLY AVAILABLE TOOLS ARE FULLY CAPABLE AND SECURE, SPO § 8(c)(5)(C)

ITC argues that, unless ITC has free reign to install whatever software it wants on the Source Code Computer, Gstar will somehow use the tool selection and installation process to "interfere with the ITC's analysis and search for copied code." (ITC Opening Br. at 7.) Specifically, ITC raises the following concerns: 1) commercially available tools are inadequate; 2) ITC must not be "unalterably locked in" to pre-selected tools; 3) allowing Gstar to install the tools would risk the "trade secret nature" of the tools and present opportunity for malfeasance by Gstar; and 4) allowing Gstar to "evaluate and decide" what tools will be loaded in advance will, again, present opportunity for malfeasance by Gstar. Each of these points is factually incorrect and addressed in turn below. Gstar's proposal is more than adequate for ITC's needs, presents no security risk for ITC, and does so while avoiding the most significant risk of a source code review, the disclosure of a party's source code material to a competitor.



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

First, ITC suggests that commercially available tools are "basic" comparison tools, unable to detect the "many ways that copied code can be disguised and hidden." (ITC Opening Br. at 7.) ITC contrasts that with ITC's expert's tools that are "designed to overcome common methods of masking software copying and misappropriation." (*Id.*) But commercially available tools go far beyond basic comparison tools, and some are designed specifically to identify misappropriated source code and overcome methods of masking it. For example, one commercially available tool, Code Suite by Software Analysis and Forensic Engineering, does exactly that. *See* Code Suite, *available at* http://safe-corp.com/products_codesuite.htm. Aside from running exact or nearly exact match comparisons of every line in every file with every other file, Code Suite includes multiple tools for overcoming methods of hiding stolen code. *Id.* Code Suite's "CodeCross" tool "cross-compares statements in one set of files to comments in the other set of files, and vice versa, in order to find code that has been commented out," thus "find[ing] areas of source code that were used as guides to develop other source code." *Id.* And Code Suite's "CodeMatch" tool "uses unique algorithms to find various different ways that source code files are correlated," including the ability to find "even source code that has been modified to avoid detection." *See* Code Match, *available at* http://safe-corp.com/products_codematch.htm. This is just one of the numerous, powerful commercially available tools that are used for source code comparison. ITC has made no explanation why such tools are insufficient for the purposes of this litigation.

Second, Gstar's proposal would not leave ITC "unalterably locked" into a set of tools. Gstar's proposal merely requires three days notice in advance of when ITC wishes to have an additional tool available for use.

Third, allowing Gstar to install the tools itself on Gstar's computer risks neither ITC's trade secrets nor its security. The issue of trade secrets embodied in ITC's expert's software can be avoided by using only commercially available tools. As for security, having the producing



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

party install the tools on its own computer is standard practice. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 11-CV-01846-LHK, 2012 WL 10817203, at *7 (N.D. Cal. Jan. 30, 2012); *FastVDO LLC v. AT&T Mobility LLC*, 16-CV-385-H-WVG, 2016 WL 9049521, at *8 (S.D. Cal. July 25, 2016). To the extent that ITC were concerned about Gstar somehow altering the software tool during installation, Gstar would have no issue allowing ITC to observe the installation of the tools.

Fourth, ITC's concern that Gstar can "evaluate and decide" what tools to install and thereby interfere with ITC is baseless. In Gstar's proposed SPO language, ITC is the only party that gets to choose what commercially available tools its expert uses. SPO § 8(c)(5)(C). While Gstar's proposal could presumably allow Gstar to challenge whether a tool is "commercially available" or "reasonably necessary," that is a challenge that Gstar would have to be able to make in good faith to the Court, and not one that Gstar is permitted to adjudicate unilaterally.

Ultimately, as with any computing device, every piece of software installed on the Source Code Computer presents a new vulnerability to the security of the contents stored thereon. A software program could advertently or inadvertently re-enable a network connection. A software program could store copies of source code in unexpected locations on the computer, making it harder to delete later. A software program could do many other things that needlessly put at risk the critically sensitive source code information stored on the Source Code Computer. Commercially available source code analysis tools have been used many times by many parties, increasing the likelihood that any such unwanted behavior has been detected and removed. Allowing the use of only commercially available tools on the Source Code Computer strikes the right balance between protecting the source code stored thereon, and allowing the parties to fully analyze their cases.



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

## VI. ITC'S ARGUMENT FOR ELECTRONIC PRODUCTION IS PREMISED ON REQUESTING AN UNREASONABLE AMOUNT OF SOURCE CODE PRODUCTION, SPO §§ 8(c)(6), 8(d)

To explain why ITC should be able to take home Gstar's source code in electronic format instead of paper–the Model Order's standard—ITC conjures visions of experts flipping through "thousands or even tens of thousands of pages of paper" and "combing through" "boxes and boxes of paper" for "hundreds of hours."

But these visions are untethered from reality, premised on an amount of production that would not be permissible under the agreed portions of the SPO. The SPO, using mostly the Model Order language, states that a party may request: "copies of ***limited portions*** of the source code or Source Code Analysis Result Files that are ***reasonably necessary*** for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, ***but shall not request paper copies for the purposes of reviewing the source code other than electronically*** as set forth in subsection (5) in the first instance." SPO § 8(d) (emphasis added). While ITC speaks of "tens of thousands" of pages, several hundred would be a more realistic expectation for the top end of what would be reasonable. Parties often agree to place a limit on the number of source code printouts around 250 pages with batches of no more than 30 consecutive pages. *Guitar Apprentice, Inc. v. Ubisoft, Inc.*, 213CV02903JPMTMP, 2014 WL 12769613, at *9 (W.D. Tenn. Nov. 6, 2014) (250 total pages, no more than 30 consecutive); *Uniloc 2017 LLC v. Microsoft Corp.*, 818CV02053AGJDEX, 2019 WL 451345, at *4 (C.D. Cal. Feb. 5, 2019) (250 total pages, no more than 35 consecutive); *see also* Agreed Protective Order Regarding Disclosure and Use of Discovery materials at 17, Memory Integrity, LLC v. Intel Corp., No. 3:15-cv-00262-SI (D. Or. June 3, 2015) (150 total pages). And where parties dispute the amount that should be produced, courts regularly decide to allow similar amounts, or less. *Unwired Planet LLC v. Apple Inc.*, 3:12-CV-00505-RCJ, 2013 WL 1501489, at *7 (D. Nev. Apr. 11, 2013) ("The court finds that Apple has established good cause to limit the amount of source code that Unwired may print beyond that which is 'reasonable.' Having considered the



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

parties' positions, the court orders that Unwired shall be limited to printing 250 pages of source code and thirty continuous pages."); *Protegrity Corp. v. Epicor Software Corp.*, 3:13 CV 1781 JBA, 2014 WL 3864899, at *4 (D. Conn. Aug. 6, 2014) (150 pages).

A greater volume of source code printouts (or electronic copies in ITC's proposal) is unreasonable because that creates an unreasonable security risk. Again, this discussion does not limit the volume of source code ITC is allowed to view electronically on the Source Code Computer. This pertains only to the copies that ITC requests to have produced to take back to ITC's or its expert's premises. Any copies of a company's source code that are placed into the hands of opposing counsel and the opposing party's expert is source code that is no longer under the party's control. Every such page is another page at risk, and the more such pages, the greater the scope of the risk. Thus, the Model Order provides that a receiving party may only request copies of "limited portions of source code that are reasonably necessary," and courts often enforce a limit in the hundreds of pages, because any greater allowance creates an unreasonable risk that outweighs its benefit to the litigation.

Given that ITC's only argument in favor of electronic copies of source code is based on an unrealistic depiction of source code printouts, ITC's request for electronic copies of source code has no basis and should be rejected.

## VII. ITC WAIVED ANY ARGUMENT THAT ALL REVISION HISTORY SHOULD BE PRODUCED TO THE SOURCE CODE COMPUTER, SPO § 8(c)(1)

ITC seeks to add language at the end of SPO § 8(c)(1) that "and the metadata mentioned above will be produced." During conferrals, ITC explained that it sought to have all of Gstar's source code revision history produced on the Source Code Computer. Gstar addressed this issue in its opening brief (Gstar Opening Br. at 4–6), but ITC did not. To the extent ITC addresses this issue for the first time in its response brief, Gstar will have no opportunity to respond to those arguments. Gstar would be unfairly prejudiced based entirely on ITC's actions, so it would be appropriate for the Court to treat this issue as waived.



**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

DATED: August 3, 2020

**PERKINS COIE LLP**

By: *s/ Kyle R. Canavera*

**Julia E. Markley**, OSB No. 000791
JMarkley@perkinscoie.com
**Sasha Petrova**, OSB No. 154008
SPetrova@perkinscoie.com
**Kyle Ryan Canavera** (*Pro Hac Vice*)
KCanavera@perkinscoie.com
**W. Matthew Pierce** (*Pro Hac Vice application pending*)
WPierce@perkinscoie.com
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

*Attorneys for Defendant Suzhou Gstarsoft Co., Ltd.*