**Julia E. Markley**, OSB No. 000791
JMarkley@perkinscoie.com
**Sasha Petrova**, OSB No. 154008
SPetrova@perkinscoie.com
**Kyle Ryan Canavera** (*Pro Hac Vice*)
KCanavera@perkinscoie.com
**William Matthew Pierce** (*Pro Hac Vice*)
WPierce@perkinscoie.com
**PERKINS COIE LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

*Attorneys for Defendant*
*Suzhou Gstarsoft Co., Ltd.*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THE INTELLICAD TECHNOLOGY CONSORTIUM,<br><br>               Plaintiff,<br><br>v.<br><br>SUZHOU GSTARSOFT CO. LTD.,<br><br>               Defendant. | No. 3:19-cv-01963-SI<br><br>**GSTAR'S MOTION TO COMPEL INTERROGATORY RESPONSES AND FOR A PROTECTIVE ORDER**<br><br>By Defendant Suzhou Gstarsoft Co., Ltd.<br><br><br>Oral Argument Requested |

GSTAR'S MOTION TO COMPEL INTERROGATORY
RESPONSES AND FOR A PROTECTIVE ORDER

149861195.9

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

# TABLE OF CONTENTS

Page

MOTION ....................................................................................................................... 1

MEMORANDUM OF LAW ........................................................................................... 1

I.     Introduction ................................................................................................... 1

II.    Background .................................................................................................... 2

       A.    Factual Background ............................................................................ 2

       B.    Procedural Background ...................................................................... 3

III.   Legal Standards ............................................................................................. 5

IV.    Argument ....................................................................................................... 7

       A.    ITC should identify its trade secrets with reasonable particularity
             before Gstar is required to produce its source code. ................................. 7

             1.    ITC's identification of its trade secrets as "source code,
                   processes, and tools" is insufficient under applicable law ............. 7

             2.    The fact that IntelliCAD and GstarCAD both emulate the
                   industry-leading AutoCAD means that early identification
                   of trade secrets is particularly warranted in this case. ................. 10

                   a.    AutoCAD is the industry standard CAD product
                         that other competitors emulate ......................................... 11

                   b.    AutoCAD workalike companies like Gstar and ITC
                         reuse or refer to the same third-party tools and
                         specifications to achieve a similar implementation,
                         and those similarities cannot be a trade secret ................. 12

             3.    The balance of interests weighs in favor of requiring ITC to
                   identify its trade secrets with reasonable particularity
                   before ITC is allowed to proceed with a source code review ...... 15

       B.    ITC should be required to supplement its responses to the
             remaining interrogatories that relate to its trade secrets. ........................ 17

V.     Conclusion .................................................................................................. 18

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

149861195.9

## TABLE OF AUTHORITIES

**Page**

CASES

*Andritz, Inc. v. J&L Fiber Servs., Inc.*,
  No. 3:12-CV-809 AA, 2013 WL 12216758 (D. Or. Mar. 19, 2013) ......................................17

*Citcon USA, LLC v. RiverPay Inc.*,
  No. 18-CV-02585-NC, 2019 WL 2603219 (N.D. Cal. June 25, 2019) ...................................8

*DropzoneMS, LLC v. Cockayne*,
  No. 3:16-CV-02348-YY, 2019 WL 7630788 (D. Or. Sept. 12, 2019) ..............................7, 14

*Imax Corp. v. Cinema Techs., Inc.*,
  152 F.3d 1161 (9th Cir. 1998) ............................................................................................15

*Keywords, LLC v. Internet Shopping Enterprises, Inc.*,
  No. CV 05-2488 MMM (EX), 2005 WL 8156440 (C.D. Cal. June 29, 2005).....................7, 9

*Loop AI Labs Inc. v. Gatti*,
  195 F. Supp. 3d 1107 (N.D. Cal. 2016) .............................................................................9, 10

*Loop AI Labs Inc v. Gatti*,
  No. 15-CV-00798-HSG(DMR), 2015 WL 9269758 (N.D. Cal. Dec. 21, 2015)...................17

*Nike, Inc. v. Enter Play Sports, Inc.*,
  305 F.R.D. 642 (D. Or. 2015) .......................................................................................9, 10, 16

*Opal Labs, Inc. v. Sprinklr, Inc.*,
  No. 3:18-CV-01192-HZ, 2019 WL 6528589 (D. Or. Dec. 4, 2019) ...................................6, 9

*Quaiz v. Rockler Retail Grp., Inc.*,
  No. 3:16-CV-1879-SI, 2017 WL 960360 (D. Or. Mar. 13, 2017)......................................9, 10

*Soc. Apps, LLC v. Zynga, Inc.*,
  4:11-CV-04910 YGR, 2012 WL 2203063 (N.D. Cal. June 14, 2012) ...................................8

*St. Jude Med. S.C., Inc. v. Janssen-Counotte*,
  305 F.R.D. 630 (D. Or. 2015) .........................................................................................15, 16

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
  147 F. Supp. 3d 1147 (D. Or. 2015) ............................................................................. passim

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

149861195.9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
   80 F. Supp. 3d 1152 (D. Or. 2015) ...........................................................................6

*WeRide Corp. v. Kun Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-
   EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019).................................................8

**STATUTES**

Oregon Revised Statutes 646.461, et seq...................................................................6, 10

Oregon Uniform Trade Secrets Act ...............................................................................3

**OTHER AUTHORITIES**

2019, Graphic Speak (available at https://gfxspeak.com/2019/04/16/autocad-
   workalike-market/)..................................................................................................11

Clone Wars, AECMagazine (available at https://www.aecmag.com/59-
   features/1394-the-clone-wars-cad-bim-manufacturing) ........................................10

Fed. Cts. L. Rev. 1, 17 (2012) (available at
   https://www.yumpu.com/en/document/read/40833800/computer-software-
   related-litigation-federal-courts-law-review)...........................................................8

Fed. R. Civ. P. 26 ...........................................................................................................6

Fed. R. Civ. P. 33 ...........................................................................................................5

Fed. R. Civ. P. 34 ......................................................................................................1, 5

Fed. R. Civ. P. 37 ...........................................................................................................6

https://www.autodesk.com/products.........................................................................11

https://www.bricsys.com/estore/); ............................................................................11

IntelliCAD from Softdesk, WoldCAD Access (available at
   https://www.worldcadaccess.com/blog/2015/05/lawyer-tells-story-how-visio-
   got-intellicad-from-softdesk.html)...........................................................................2

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

149861195.9

## MOTION

Pursuant to Federal Rules of Civil Procedure 26 and 37, Defendant Suzhou Gstarsoft Co., Ltd. ("Gstar") respectfully moves for entry of:

(1) an order compelling Plaintiff The IntelliCAD Technology Consortium ("ITC") to supplement its response to Interrogatory No. 1 to identify with reasonable particularity the trade secrets that ITC claims it disclosed to Gstar;

(2) a protective order excusing Gstar from complying with ITC's FRCP 34 request to inspect Gstar's source code until ITC identifies its trade secrets with reasonable particularity; and

(3) an order compelling ITC to supplement its responses to Interrogatories Nos. 2-7 and 9, which directly relate to ITC's response to Interrogatory No. 1 and which currently lack sufficient detail.

Pursuant to LR 7-1, Gstar certifies that it has conferred by telephone conference and follow-up emails with ITC about the relief requested in this motion, and the parties were unable to resolve the dispute. This Motion is supported by the following Memorandum of Law and the Declarations of Jiang Liang and Julia Markley.

1-    GSTAR'S MOTION TO COMPEL INTERROGATORY
RESPONSES AND FOR A PROTECTIVE ORDER

149861195.9

## MEMORANDUM OF LAW

### I.     Introduction

A plaintiff in a trade secret action must identify its trade secrets with "reasonable particularity."  The law imposes this requirement in part to allow the accused party to defend itself against a trade secret misappropriation claim by providing the opportunity to understand and analyze the plaintiff's claims, develop defenses, and take discovery on the defenses that relate to the specific trade secret alleged.

ITC has defined its trade secrets as ITC's entire "source code, processes, and tools," which is too general, vague, and bereft of detail to afford Gstar a fair opportunity to defend itself against ITC's claims.  Moreover, ITC should identify its trade secrets before Gstar produces its highly confidential source code to ITC.  Early identification of trade secrets is especially warranted in this case because both parties produce a product that is intended to emulate the industry leading CAD platform, AutoCAD.  The result is that comparison of ITC's and Gstar's products is certain to identify many identical features, which features cannot be appropriately claimed as trade secrets by ITC or anyone at all.  If ITC does not identify its trade secrets with reasonable particularity at the outset of the case, then Gstar will be deprived of the opportunity to conduct the needed research and third-party discovery to disprove any of ITC's eventual claims of ownership of trade secrets that are not their own.  Courts have required parties to sequence discovery in this way to prevent a trade secret plaintiff from tailoring its identification of trade secrets to reflect whatever it may discover in the defendant's trade secrets.  Thus, requiring ITC to define its trade secrets now will facilitate fairness, efficiency, and the development of the facts that are necessary to resolve the merits of ITC's claims, for which ITC seeks significant damages and injunctive relief.

ITC's responses to additional interrogatories lack detail for the additional reasons detailed below, and should also be supplemented.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

## II.    Background

### A.    Factual Background

Gstar is a company that produces CAD software—a technology that is used to create two- and three-dimensional designs, such as for architectural designs, building blueprints, and industrial product designs.  Declaration of Jiang Liang in support of Motion to Compel and for a Protective Order ("Liang Decl.") ¶ 2.  ITC is a membership-based consortium of international CAD software developers who develop and maintain the IntelliCAD software platform, which is used for developing digital design solutions.  Second Am. Compl. ("SAC") ¶ 1.  Both Gstar and ITC compete in the AutoCAD alternative, or workalike, market, which offers lower cost CAD software than AutoCAD, the leading platform in the CAD industry.  *See id.* ¶¶ 10, 18, 29(b); Liang Decl. ¶ 5.

Between 2003 and 2015, when Gstar was a member of ITC, ITC provided Gstar with several versions of the IntelliCAD platform source code.  *See* SAC ¶ 18.  The original IntelliCAD source code was built and owned by third parties, meaning that those portions of the source code may not belong to ITC.  *See id.* ¶¶ 8-11 (stating that ITC code was previously developed and owned by Boomerang Technology, Inc. and then by Visio Corporation, until Visio divested itself of IntelliCAD and was acquired by Microsoft).  Some industry sources indicate that when Visio spun out ITC into a separate entity, Visio retained ownership of the IntelliCAD source code.  *See* Lawyer tells inside story how Visio got IntelliCAD from Softdesk, WoldCAD Access (available at https://www.worldcadaccess.com/blog/2015/05/lawyer-tells-story-how-visio-got-intellicad-from-softdesk.html) ("Visio, however, retained ownership of the IntelliCAD code base.") ("Inside Story Article").  In 2015, ITC terminated Gstar's membership after accusing Gstar of misusing ITC's source code in Gstar's development of its own CAD platform, GstarCAD 8.  SAC ¶¶ 21-24.  Gstar in fact independently developed GstarCAD 8 and denies any improper conduct.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**B.     Procedural Background**

ITC did not file the underlying lawsuit against Gstar until December 3, 2019, alleging

claims for trade secret misappropriation, copyright infringement, and breach of fiduciary duties.

Dkt. 1.  None of ITC's three complaints in this case have been filed under seal.  Dkt. 1

(Complaint); Dkt. 14 (First Am. Compl.); Dkt. 32 (SAC).

ITC's operative complaint, which seeks $10 million in damages and injunctive relief,

alleges that Gstar misappropriated ITC's trade secrets in violation of the Oregon Uniform Trade

Secrets Act.  ITC alleges that "Gstar knowingly, willingly, and unlawfully has acquired,

disclosed, and/or used or intends to use the ITC's trade secrets through improper means."  SAC

¶ 44.  The sole allegations pertaining to what ITC claims are its trade secrets are as follows:

> The ITC's confidential information, including its IntelliCAD
> source code, constitutes information that has independent
> economic value because it is unknown to others and is the subject
> of reasonable efforts to maintain its secrecy or limit its use. It
> therefore qualifies as a trade secret within the meaning of Oregon
> Revised Statutes 646.461, et seq.

*Id.* ¶ 42.

On July 23, 2020, four weeks after discovery opened and approximately two weeks after

the Court's scheduling conference, Gstar served interrogatories requesting that ITC identify its

trade secrets and confidential information with reasonable particularity.  Decl. of Julia Markley

in support of Mot. to Compel and for a Protective Order ("Markley Decl.") Ex. 1 (Def. Gstar's

First Set of Interrogatories (Nos. 1-10)); ¶ 2 (parties held Rule 26(f) conference on June 25,

2020).  Gstar's interrogatories were the first set of discovery requests served in the case.

Specifically, Interrogatory No. 1 requested that ITC "[i]dentify with reasonable particularity each

trade secret that You allege has been misappropriated by Gstar, including, but not limited to, any

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

and all trade secrets You refer to in paragraphs 16 and 42-50 of the Complaint." *Id.*, Ex. 1 at 4.[1]

Interrogatory No. 2 sought to distinguish ITC's "confidential information" that does not rise to

the level of a trade secret from the "trade secret" identified in Interrogatory No. 1. *Id.*

Interrogatories Nos. 3 through 9 requested additional information related to "each trade secret

[ITC] identified in response to Interrogatory No. 1." *Id.* at 4-6.

      ITC responded on August 21, 2020, by generally identifying ITC's trade secrets as its

"source code, processes, and tools." *Id.* Ex. 2 at 2 (Pl.'s Resp. to Def. Gstar's First Set of

Interrogatories (Nos. 1-10)).  ITC also identified the verbatim "source code, processes, and

tools" as its confidential information distinct from its trade secrets.  *Id.*  Although ITC had

requested, and the Court ordered, that information could be designated confidential under the

forthcoming Protective Order, ITC did not designate its responses as confidential.  Markley

Decl., Ex. 3 (8.10.2020 Hearing Tr. 76:1-16).

      ITC's responses to Interrogatories Nos. 3-7 and 9 are deficient in additional ways, apart

from their reference to Interrogatory No. 1.  Interrogatories Nos. 3, 5, 6, and 9 each ask, in part,

for the names of individuals or firms with information relevant to an aspect of an element of

ITC's trade secret misappropriation claim.  But ITC did not provide any names or other

information sufficient to allow Gstar to investigate the facts, to conduct witness interviews, and

to consider taking depositions or issuing third-party subpoenas.  For example, Interrogatory

No. 3 seeks "all persons who were involved in the creation or development of said trade secret or

---

[1] During their September 4, 2020, conferral, Gstar clarified that it is seeking identification of all trade secrets that ITC claims to have disclosed to Gstar, rather than trade secrets that ITC claims that Gstar misappropriated.  Markley Decl. ¶ 6.  Gstar emphasizes this point because, in ITC's September 29, 2020 email to the Court in connection with this Motion, ITC stated that it could not identify the trade secrets that Gstar had misappropriated until ITC reviewed Gstar's source code.  But Gstar does not seek in Interrogatory No. 1 identification of *misappropriated* trade secrets, as Gstar agrees that would be premature at this time (and, of course, denies misappropriation).  Gstar's Interrogatory No. 8 seeks identification of each instance of alleged misappropriation, and Gstar does not move to compel supplementation of that interrogatory response at this time.  Rather, in this motion, Gstar seeks identification of ITC's trade secrets that ITC *disclosed* to Gstar.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

confidential information." Markley Decl., Ex. 1 at 4. ITC responded "the ITC's employees, contractors, licensors, and members." *Id.*, Ex. 2 at 3. No list of names or firms was provided or promised. Similarly, although Interrogatory No. 9 asks a different question (which third parties have had access to ITC's trade secrets), ITC gave the same verbatim response: "the ITC's employees, contractors, licensors and members." *Id.* at 7. As another example, Interrogatory No. 6 seeks information about when another party breached its confidentiality obligations to ITC with respect to ITC's alleged trade secret or confidential information. Markley Decl., Ex. 1 at 5. ITC identified, at a high level, three instances where it alleged that a former member had misappropriated its trade secrets: one resulted in a private settlement agreement, one resulted with the member complying with its post-termination obligations, and in the last instance the member re-joined the ITC. Markley Decl., Ex. 2 at 5. But ITC failed to provide any detail regarding who these parties were, what was misappropriated, and when.

At the conclusion of their September 4, 2020, conferral, ITC requested additional time to consider Gstar's position with respect to trade secret identification but declined to provide further details in response to Interrogatories Nos. 3-7 and 9. *Id.* ¶ 6. Ultimately, ITC declined to further define its trade secrets, maintaining that "[t]he IntelliCAD source code is in its entirety a trade secret of the ITC, as are all of the components and pieces of said source code." *Id.*, Ex. 4.

On September 21, 2020, ITC served a request pursuant to FRCP 34(a) to inspect Gstar's source code for "GstarCAD and its derivatives and the related revision history(ies) and source code repository(ies) within thirty (30) days of service hereof." *Id.* Ex. 5. Gstar objected to this request, in part because ITC has not yet reasonably identified its trade secrets. *Id.* Ex. 6.

## III.    Legal Standards

Any party may serve an interrogatory relating to "any matter that may be inquired into under Rule 26(b)." Fed. R. Civ. P. 33(a)(2). If the party refuses to answer or fails to provide a

5-    MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
      TO COMPEL AND FOR A PROTECTIVE ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

149861195.9

complete answer, the court may issue an order compelling the party to answer the interrogatory. Fed. R. Civ. P. 37(a)(3)-(4).  For good cause, a court may issue an order to protect a party or person from oppression or undue burden, including "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way."  Fed. R. Civ. P. 26(c)(1)(G).

To state a claim for a trade secret violation under Oregon's Uniform Trade Secrets Act, ORS 646.461-646.475, a party must demonstrate that "(1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation." *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 80 F. Supp. 3d 1152, 1163 (D. Or. 2015) ("*Vesta II*").  "In a trade secret case, the plaintiff must identify the trade secrets and carry the burden of showing that they exist."  *Opal Labs, Inc. v. Sprinklr, Inc.*, No. 3:18-CV-01192-HZ, 2019 WL 6528589, at *1 (D. Or. Dec. 4, 2019) (quotation marks and citation omitted).  The plaintiff must "identify its alleged trade secrets with reasonable particularity," by providing "a description of the trade secrets at issue that is sufficient to (a) put a defendant on notice of the nature of the plaintiff's claims and (b) enable the defendant to determine the relevancy of any requested discovery concerning its trade secrets."  *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 147 F. Supp. 3d 1147, 1155-56 (D. Or. 2015) ("*Vesta I*") (citing *BioD, LLC v. Amnio Tech., LLC*, No. 2:13-CV-1670-HRH, 2014 WL 3864658, at *5 (D. Ariz. Aug. 6, 2014)).  The plaintiff "must provide enough detail about [its] alleged trade secrets to at least suggest that the alleged trade secrets might be legally protectible."  *Id.*

The "reasonable particularity" standard, which has been recognized by a "growing consensus" of courts, reflects the court's authority pursuant to FRCP 26 requiring early disclosure of evidence and the court's authority to control the timing and sequencing of discovery in the interests of justice.  *Vesta I*, 147 F. Supp. 3d at 1153-54.  Whether a party has

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

described its alleged trade secrets with sufficient particularity is a fact-intensive inquiry that is assessed on a case-by-case basis. *Id.* at 1155.

## IV.   Argument

### A.   ITC should identify its trade secrets with reasonable particularity before Gstar is required to produce its source code.

The key issue before this Court is whether ITC has described its trade secrets with sufficient particularity so as to require Gstar, at this time, to disclose its own trade secrets in response to ITC's request to inspect Gstar's source code.

### 1.   ITC's identification of its trade secrets as "source code, processes, and tools" is insufficient under applicable law.

ITC has failed to define its trade secrets with "reasonable particularity," as is required of a plaintiff in a trade secret misappropriation case.

Identification of "source code" as a trade secret is overbroad and has been held insufficient to state a claim for trade secret misappropriation under applicable law. *See DropzoneMS, LLC v. Cockayne*, No. 3:16-CV-02348-YY, 2019 WL 7630788, at *1 (D. Or. Sept. 12, 2019) (granting summary judgment where the plaintiff described its trade secrets as "source code" because "failure to describe [] trade secrets with sufficient particularity is fatal to [] trade secret misappropriation claims"); *Keywords, LLC v. Internet Shopping Enterprises, Inc.*, No. CV 05-2488 MMM (EX), 2005 WL 8156440 (C.D. Cal. June 29, 2005) (denying motion for preliminary injunction because the plaintiff had "failed to identify what portions of the source codes constitute[d] trade secrets, and the court thus [could not] determine whether they meet the UTSA's definition of a trade secret")[2]; *see also* Loren, Prof. Lydia Pallas and Johnson-Laird, Andy, Computer Software-Related Litigation: Discovery and The Overly-Protective Order, 6

---

[2] Oregon courts have held that the reasonable particularity requirement "is not limited to cases applying California's unique statutory requirement," *Vesta I*, 147 F. Supp. 3d at 1153, and therefore decisions from California are appropriately considered as persuasive authority.

Fed. Cts. L. Rev. 1, 17 (2012) (available at

https://www.yumpu.com/en/document/read/40833800/computer-software-related-litigation-

federal-courts-law-review) (noting that forensic software analysis of a trade secret

misappropriation claim "can only be determined . . . with a clear statement of what exactly are

the alleged trade secrets at a sufficient level of detail to recognize those secrets if they are used in

the source code"). Indeed, courts have consistently rejected plaintiffs' attempts to define their

trade secrets at high levels of generality. *See, e.g.*, *Citcon USA, LLC v. RiverPay Inc.*, No. 18-

CV-02585-NC, 2019 WL 2603219, at *2 (N.D. Cal. June 25, 2019) (denying preliminary

injunction because party had failed to identify with reasonable particularity what source code

was allegedly misappropriated where party's complaint defined that source code by listing five

payment processing algorithms); *Soc. Apps, LLC v. Zynga, Inc.*, 4:11-CV-04910 YGR, 2012 WL

2203063, at *5 (N.D. Cal. June 14, 2012) ("SocialApps has only offered the most general

concepts to describe what it believes is its trade secret information. This is not sufficient."). *Cf.*

*WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 841 (N.D. Cal. 2019), *modified in part*, No.

5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (plaintiff had sufficiently

identified its source code trade secrets for purposes of a preliminary injunction motion when it

filed a twenty-page identification of ten specific trade secrets and described the functionality of

each, along with named files from its code base reflecting the source code specific to each trade

secret").

ITC's attempt to define its trade secret as its entire source code is particularly problematic

for two reasons unique to this case. First, as detailed in Section IV.A.2 below, because of the

specific industry at issue—the AutoCAD alternative, or workalike, market—many aspects of

ITC's software products will be identical to the features for other parties' products because

competitors are trying to emulate the features of the market leader, AutoCAD. Furthermore,

because ITC may not even be the owner of the copyrights and trade secrets in the original

IntelliCAD source code, *see* Inside Story Article, even source code that is secret and unique to IntelliCAD may not be the proper basis for ITC's claims in this case.

ITC's identification of its trade secrets as "processes" and "tools" is similarly deficient for lack of particularity, especially because ITC identifies its non-trade secret "confidential information" as the very same "processes and tools." *See* Markley Decl., Ex. 2 at 2; *Vesta I*, 147 F. Supp. 3d at 1156 ("Plaintiff may not claim that a particular method or process is a trade secret at this stage of the litigation "without identifying the steps in the process and explaining how those steps make [the] method or process unique.") (quoting *BioD*, 2014 WL 3864658 at *5)); *Keywords, LLC*, 2005 WL 8156440, at *17 (party's attempt to define its trade secret as a "Method of Retrieving Information Using Combined Context Based Searching and Content Merging" deemed insufficient because party offered no explanation "regarding the nature of the Method, nor how or where it is reflected in the . . .  source codes that were allegedly stolen"); *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016) (concluding that plaintiff's trade secret disclosure, which consisted of "a publicly-filed document listing 55 paragraphs of purported trade secrets" that read "like an inventory of categories of Plaintiff's scientific or strategic business information," fell short of the "reasonable particularity" standard).

The case law on which ITC is likely to rely is readily distinguishable.  For example, ITC will likely cite cases where this Court ruled the plaintiff had sufficiently identified its trade secrets. *See*, *e.g.*, *Opal Labs, Inc. v. Sprinklr, Inc.,* No. 3:18-CV-01192-HZ, 2019 WL 6528589, at *1 (D. Or. Dec. 4, 2019); *Quaiz v. Rockler Retail Grp., Inc*., No. 3:16-CV-1879-SI, 2017 WL 960360 (D. Or. Mar. 13, 2017); *Nike, Inc. v. Enter Play Sports, Inc.*, 305 F.R.D. 642, 644 (D. Or. 2015).  But in those cases, in stark contrast to the facts of this case, the plaintiffs had provided significant detail about their trade secrets, including drawings, illustrations, and exhibits, or had filed their complaint under seal.  *See Opal Labs*, 2019 WL 6528589 at *1 (concluding that plaintiff sufficiently identified ten trade secrets where plaintiff provided an exhibit that

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

"contained additional details about the structure, functions, and capabilities that it claims are trade secrets" and cited testimony by the co-founder and vice president about the claimed trade secrets); *Quaiz*, 2017 WL 960360 at \*3-4 (concluding that description of trade secrets was sufficient because plaintiff provided 14 drawings describing the single design at issue, which was a corner clamp for use in woodworking); *Nike*, 305 F.R.D. at 644 (plaintiff filed its complaint under seal with "numerous specifics, including drawings and illustrations" for the product at issue). Here, by contrast, ITC publicly filed its pleadings and has not provided exhibits, lists, drawings, illustrations, or details of its trade secrets.[3]

> **2.     The fact that IntelliCAD and GstarCAD both emulate the industry-leading AutoCAD means that early identification of trade secrets is particularly warranted in this case.**

The unique fact pattern in this case especially warrants an early identification of ITC's alleged trade secrets. That is because both ITC's CAD software, IntelliCAD, and Gstar's CAD software, GstarCAD 8, are designed to emulate or mimic the functionality, features, appearance, and operation habits of a third-party product called AutoCAD. The result is that "AutoCAD workalikes" or "AutoCAD alternatives"—such as IntelliCAD, GstarCAD, and many others—are designed specifically to have many of the same functions and features, use many of the same third-party components, and generally be more alike than not. *See* The Clone Wars, AECMagazine (available at https://www.aecmag.com/59-features/1394-the-clone-wars-cad-bim-manufacturing) (describing the genesis of AutoCAD workalikes, including IntelliCAD) ("Clone

---

[3] Indeed, if ITC had provided sufficient detail in its pleadings, then it would have been necessary to file its complaint under seal to maintain the secrecy of that information. *See* ORS 646.461(4) ("Trade secret" means information that "(a) Derives independent economic value, actual or potential, *from not being generally known to the public* or to other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to *maintain its secrecy*." (emphases added)); *see also Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1112 (N.D. Cal. 2016) ("As a preliminary matter, the fact that Plaintiff publicly filed its trade secret disclosure belies the proposition that it contains information specific enough to be considered 'confidential' trade secrets.").

10- MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
    TO COMPEL AND FOR A PROTECTIVE ORDER

149861195.9

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

Wars"). Thus, the comparison of IntelliCAD and GstarCAD is certain to find many identical features, which features are not the trade secrets of IntelliCAD or anyone at all. If ITC does not identify its trade secrets with reasonable particularity at the outset of the case, then Gstar will be faced with the prospect of an inordinate amount of work to research, conduct party and third-party discovery on defenses, and commission an expert report(s) to disprove any of ITC's eventual claims of ownership of trade secrets that are not their own. There is insufficient time in the schedule for this case for Gstar to challenge trade secrets about which it learns for the first time at the end of fact discovery (March 5, 2021) or upon receipt of ITC's expert report (April 2, 2021), as Gstar's expert report is due shortly thereafter (April 30, 2021). Dkt. No. 36 (Order setting case schedule).

> **a.      AutoCAD is the industry standard CAD product that other competitors emulate**

AutoCAD is a CAD tool created and marketed by third-party Autodesk. AutoCAD is the leading product in the market. Liang Decl. ¶ 5; Clone Wars. As a result, AutoCAD's file formats and user-facing functionality have become essentially an industry standard that most users would like to have at their disposal. *See* Clone Wars. But along with that high level of functionality comes the corresponding high price of AutoCAD. *See id.* (describing high subscription costs). And that price point is not appealing to many CAD users, especially small businesses and individuals.

"AutoCAD workalikes" fill this need for AutoCAD functionality at a less-than-AutoCAD price. For example, the current price for the baseline AutoCAD product is approximately $1,500 per year, whereas many AutoCAD workalikes can be purchased with a perpetual license for less than $1,000. *Compare* Markley Decl., Ex. 8 (printout of https://www.autodesk.com/products) *with* Ex. 9 (printout of https://www.bricsys.com/estore/); *see also* The AutoCAD workalike market in 2019, Graphic Speak (available at https://gfxspeak.com/2019/04/16/autocad-

11- MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
TO COMPEL AND FOR A PROTECTIVE ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

149861195.9

workalike-market/) ("AutoCAD is priced about 3x more to license annually than it is to buy a typical workalike outright.") ("AutoCAD Workalike Market")).  Gstar and ITC's member companies market AutoCAD workalikes.  Liang Decl. ¶ 5; AutoCAD Workalike Market ("The largest group of AutoCAD workalikes is based on IntelliCAD code from the IntelliCAD Technical Consortium.").  At present, there are estimated to be about 30 AutoCAD alternatives or workalikes on the market.  *See* AutoCAD Workalike Market (saying there are "three dozen or so" AutoCAD workalikes available).

> **b.    AutoCAD workalike companies like Gstar and ITC reuse or refer to the same third-party tools and specifications to achieve a similar implementation, and those similarities cannot be a trade secret**

The way that AutoCAD workalikes get to their desired endpoint—AutoCAD emulation—at such a low price point is the reason why early identification of trade secrets is especially warranted in this case.  Namely, in order to efficiently provide AutoCAD emulation, all developers of AutoCAD alternatives or workalikes reuse or refer to certain third-party tools and specifications to make their work more efficient, and thus less expensive.  *See* Clone Wars. Four specific examples are provided below.  The important takeaway is that all AutoCAD workalikes will have highly similar implementations.  As a result, a comparison of two such tools (GstarCAD and IntelliCAD here) is certain to find many similarities that are known to all developers of AutoCAD workalikes, and thus not anyone's trade secret.  Therefore, ITC's identification of its "source code" as its trade secret is grossly overinclusive and improper.

A first reason that AutoCAD workalike like IntelliCAD and GstarCAD have similar implementations is that they are typically designed to comply with AutoCAD's specification, called ObjectARX.  Liang Decl. ¶ 6.  ObjectARX provides an application programming interface (API) designed by AutoCAD.  *Id.*.  The ObjectARX API specifies details on how critical features in AutoCAD operate.  Liang Decl. *Id.*.  As a result, developers of AutoCAD workalike typically

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

build their tools to comply with these specifications in the ObjectARX API, given that their aim is to make their CAD product as similar to AutoCAD as possible. *Id.* This means that all AutoCAD workalikes are using the same specification for many critical features and thus are bound to use similar implementations. Neither the ObjectARX API, nor the well-known ways that AutoCAD workalikes implement source code to comply with that API are information that ITC could reasonably claim as a trade secret.

A second reason that AutoCAD workalikes have similar implementations is that they typically incorporate the third-party technology called Open Design Alliance (ODA). ODA is a third-party entity that develops CAD functionality and makes it available to its members, not unlike ITC's business model. *See* Liang Decl. ¶ 7. Both Gstar and ITC are members of ODA. *Id.* ODA provides SDK (Software Development Kit) and source codes similar to ObjectARX for AutoCAD drawing, data analyzing, and functionality building. *Id.* The result is that two AutoCAD workalikes, completely independently developed, can use the same reference point for their design (ObjectARX) and use the same implementation of certain CAD functionality (ODA). *Id.* This further confines what ITC could reasonably claim to be its trade secret.

A third reason that AutoCAD workalikes have similar implementations is that they typically use the same 3D modelling software, 3D ACIS Modeler (ACIS), provided by third-party Spatial Corporation. Liang Decl. ¶ 8. While it may be surprising to someone not familiar with the CAD industry, it turns out that essentially all CAD products—including industry leading AutoCAD—use the same third-party tool to provide 3D modelling functionality. *See id.* This third-party tool, ACIS, provides its own implementation of 3D modelling functionality, as well as an API that CAD programs can use to interact with that 3D modelling functionality. *Id.* Neither that third-party API nor that third-party implementation of 3D modelling functionality nor the well-known ways that AutoCAD workalikes interact with that API are information that ITC could reasonably claim as a trade secret.

13- MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
TO COMPEL AND FOR A PROTECTIVE ORDER

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

149861195.9

A fourth reason that AutoCAD workalikes have similar implementations is that they typically use the same third-party tool, Microsoft Foundation Class Library (MFC), to generate the user interface features of the program.  Liang Decl. ¶ 9.  MFC wizards are a software resource provided by Microsoft that is used to auto-generate much of the source code related to presenting an interface to a user.  *Id.*  For instance, the MFC software provides source code to implement the display of a main window, a menu bar, dialog boxes, etc.  *Id.*  Most user interface features with which a user is familiar start with the source code generated by MFC wizards.  *Id.* The result is that two AutoCAD workalikes that each have basic user interface features (which they essentially all do) will have very similar source code for the user interface layer.  This further confines what ITC could reasonably claim to be their trade secrets.

Other third-party resources, for which Gstar does not have the space to elaborate in this brief, are also used by both GstarCAD and IntelliCAD.  Liang Decl. ¶ 10.  Microsoft's COM technology (which also automatically generates source code for use in AutoCAD workalikes), Microsoft's VBA technology, and Microsoft's OLE technology are a few examples.  *Id.* ¶ 11.

The sum total of the foregoing is that two AutoCAD workalikes will inevitably have very similar implementations, and those similarities will be almost entirely *not* the trade secrets of either AutoCAD workalike's developer.  Similarity to the target, AutoCAD, is *the entire point* of this type of product.  ITC's identification of its "source code" as its trade secret is thus a gross overstatement.  *See DropzoneMS, LLC*, 2019 WL 7630788, at *11 ("Plaintiff cannot have trade secrets in source code that, by definition, is not secret.").  Allowing ITC to analyze Gstar's source code without further identification of trade secrets is certain to lead to misidentification by ITC of its alleged trade secrets and the inability of Gstar to conduct the time-intensive research and third-party discovery needed to disprove those claims.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

3.     **The balance of interests weighs in favor of requiring ITC to identify its trade secrets with reasonable particularity before ITC is allowed to proceed with a source code review**

In deciding whether a plaintiff must identify its trade secrets with greater particularity before proceeding to take discovery of the defendant's trade secrets, courts weigh competing policy factors.  *Vesta I*, 147 F. Supp. 3d at 1153-54; *St. Jude Med. S.C., Inc.,* 305 F.R.D. at 640-41.  Here, multiple policy reasons weigh in favor of requiring ITC to supplement its interrogatory responses before ITC may inspect Gstar's source code.

First, the scope of discovery in this case will be driven by what ITC can reasonably claim as a trade secret.  Although both parties need that information to proceed, Gstar will be particularly disadvantaged if ITC is permitted to defer disclosing its trade secrets until a later date.  As described in detail above, the nature of the products at issue in this case means that there will be identical features in both products that ITC cannot appropriately claim as trade secrets. Whereas ITC undoubtedly knows what trade secrets it may have, Gstar needs this information to seek appropriate discovery from ITC and third parties and to provide that information to its expert in time for him to analyze it and render an opinion.  If Gstar does not obtain the necessary discovery before fact discovery closes, Gstar's expert will be greatly disadvantaged in preparing his report.  *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998) (where plaintiff failed to sufficiently identify its trade secrets in discovery, defendant "could not be expected to prepare its rebuttal to [plaintiff's] trade secrets claim without some concrete identification of exactly which 'dimensions and tolerances' [plaintiff] alleged were incorporated into [defendant's] own projector system").  Gstar should not go through the significant expense of proving the technologies described above are not trade secrets, only to learn at the end of discovery that ITC does not (as it should not) claim those technologies as its trade secrets.

15-  MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
     TO COMPEL AND FOR A PROTECTIVE ORDER

149861195.9

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Second, requiring ITC to define its trade secrets now prevents ITC from being able to craft its trade secret claim to fit the evidence it obtains during its review of Gstar's source code. *See Vesta I*, 147 F. Supp. 3d at 1153-54 (requiring pre-discovery disclosures of alleged trade secrets "denies Plaintiff the opportunity to craft a trade secret claim to fit the evidence from the Defendants"). Without such protection, ITC will be in a position to cherry pick the parts of its source code that it wishes to prioritize in this lawsuit based on a reactive analysis of what it perceives to be similarities in Gstar's code. This is particularly important here, where over Gstar's objection, ITC's expert will be allowed to use her proprietary tool in her analysis, a tool to which Gstar does not have access. Protective Order (Dkt. 49) ¶ 8.3(e).

By contrast, the policies that support allowing a plaintiff to seek trade secret discovery prior to identifying its own claimed trade secrets do not weigh in favor of ITC. As noted, Gstar seeks that ITC identify only what portions of its source code are trade secrets that it *disclosed* to—rather than allegedly misappropriated by—Gstar. Because ITC knowingly disclosed its source code to Gstar, it should have no difficulty determining what it provided and which portions qualify as trade secrets. *See Vesta I*, 147 F. Supp. 3d at 1154 (taking into account that "[t]his is not a case where Defendants stole large volumes of documents or secrets from Plaintiff without Plaintiff's knowledge"). *Cf. St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630, 633 (D. Or. 2015) (employee's covert actions in downloading confidential data from her work computer prior to beginning work for a competitor weighed in favor of allowing discovery to proceed).

Nor does the fact that Gstar was able to file an answer and affirmative defenses to the Second Amended Complaint mean that ITC sufficiently identified its trade secrets. *See Nike, Inc.*, 305 F.R.D. at 644. Gstar's answer focuses on the factual allegations and events, and its affirmative defenses are (of course) legal in nature. In fact, ITC conferred with Gstar on the brevity of its affirmative defenses and considered filing a motion against them. *See* Markley

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Decl., ¶ 10, Ex. 7.  Gstar's counsel explained that it could not further detail its affirmative

defenses without ITC first identifying its trade secrets, and ITC never moved against Gstar's

affirmative defenses.  Moreover, motions under Rule 12(e) are "ordinarily restricted to situations

where a pleading suffers from unintelligibility rather than want of detail."  *Andritz, Inc. v. J&L*

*Fiber Servs., Inc.*, No. 3:12-CV-809 AA, 2013 WL 12216758, at *1 (D. Or. Mar. 19, 2013)

(citation and quotations omitted).  Accordingly, such motions are "viewed with disfavor, and

rarely granted."  *Id.*  Gstar therefore made the reasonable decision to use the established

procedure of seeking such information via an interrogatory and, if necessary, through a motion to

compel and for a protective order.  *See Vesta I*, 147 F. Supp. 3d at 1148-49 (granting motion for

protective order); *Loop AI Labs Inc v. Gatti*, No. 15-CV-00798-HSG(DMR), 2015 WL 9269758,

at *1 (N.D. Cal. Dec. 21, 2015) (granting motion to compel particularized trade secret discovery

and staying discovery related to trade secrets).  Gstar did so promptly, as the first party to issue

discovery requests after discovery opened.  Gstar met and conferred with ITC and sought this

Court's assistance before Gstar's response to ITC's request to produce source code was due.

    **B.**    **ITC should be required to supplement its responses to the remaining interrogatories that relate to its trade secrets.**

If this Court grants Gstar's motion to compel ITC to supplement Interrogatory No. 1, then

this Court should also grant Gstar's motion to compel ITC to supplement Interrogatories Nos. 2-

7 and 9 because they either relate to or reference and incorporate ITC's response to Interrogatory

No. 1.

Moreover, ITC's responses to Interrogatories Nos. 3-7 and 9 are deficient for the

additional and independent reason that they lack sufficient detail responsive to the interrogatory.

For example, ITC's response to Interrogatory No. 4 (requesting ITC to identify all efforts to

maintain the secrecy of its trade secrets) merely rehashes ITC's allegations from its pleadings

without providing any additional detail.  *Compare* Markley Decl., Ex. 2 at 3 ("The IntelliCAD

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

source code constitutes the ITC's most valuable and closely guarded assets and trade secrets, and the ITC has gone to great lengths to protect it.  Access to the source code is allowed only on an as-needed basis, and the ITC protects the source code by placing it in a secured source code repository.  ITC members must execute agreements for source code access and distribution.") *with* SAC ¶ 16 ("The IntelliCAD source code constitutes the consortium's most valuable and closely guarded assets and trade secrets, and the ITC has gone to great lengths to protect it. Access to the source code is allowed only on an as-needed basis, and the ITC protects the source code by placing it in a secured source code repository.  ITC members must execute agreements for source code access and distribution.").  The same is true of ITC's response to Interrogatory No. 7 (requesting ITC to identify the independent economic value of its trade secrets).  *See* Markley Decl., Ex. 2 at 5-6 (responding with allegations regarding Gstar's alleged profits "based off of its misappropriation of the IntelliCAD source code").

Further, ITC has failed to identify any specific individuals who were involved in the creation or development of its trade secrets (Interrogatory No. 3) or who were employed/affiliated with ITC and had access to its trade secrets (Interrogatory No. 5).  Indeed, other than identifying via email Dave Lorenzo as a person most knowledgeable in response to Interrogatory No. 6, ITC failed to provide even a single name in its initial responses, thus hindering Gstar's ability to proceed with investigating ITC's claims through depositions.  ITC similarly fails to provide sufficient detail regarding the circumstances under which it disclosed its trade secrets to others (Interrogatory No. 9) or specific instances where its efforts to maintain trade secret secrecy were breached (Interrogatory No. 6).  These requests go to the heart of whether ITC can maintain its misappropriation claim, and therefore ITC should be required to provide sufficient information to allow Gstar to test ITC's claims.

## V.     Conclusion

For the foregoing reasons, Gstar respectfully requests that the Court grant this Motion.

**Perkins Coie LLP**
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

DATED:  October 22, 2020                    **PERKINS COIE LLP**

By: *s/ Julia E. Markley*
        **Julia E. Markley**, OSB No. 000791
        JMarkley@perkinscoie.com
        **Sasha Petrova**, OSB No. 154008
        SPetrova@perkinscoie.com
        **Kyle Ryan Canavera** (*Pro Hac Vice*)
        KCanavera@perkinscoie.com
        **William Matthew Pierce** (*Pro Hac Vice*)
        1120 N.W. Couch Street, 10th Floor
        Portland, OR  97209-4128
        Telephone:  503.727.2000
        Facsimile:  503.727.2222

*Attorneys for Defendant*
*Suzhou Gstarsoft Co., Ltd.*

19-  MEMORANDUM IN SUPPORT OF GSTAR'S MOTION
      TO COMPEL AND FOR A PROTECTIVE ORDER

149861195.9