IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **THE INTELLICAD TECHNOLOGY CONSORTIUM**, <br><br> Plaintiff, <br><br> v. <br><br> **SUZHOU GSTARSOFT CO. LTD**, <br><br> Defendant. | Case No. 3:19-cv-1963-SI <br><br> **OPINION AND ORDER** |

Craig R. Berne and Shawn M. Lindsay, Harris Berne Christensen llp, 15350 SW Sequoia Parkway, Suite 250, Portland, OR 97224. Of Attorneys for Plaintiff.

Julia E. Markley and Sasha A. Petrova, Perkins Coie llp, 1120 NW Couch Street, 10th Floor, Portland, OR 97209; Kyle R. Canavera, Perkins Coie llp, 11988 El Camino Real, Suite 300, San Diego, CA 92130; and William Matthew Pierce, Perkins Coie llp, 1900 16th Street, Suite 1400, Denver, CO 80202. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

The IntelliCAD Technology Consortium (the ITC) brings this lawsuit against Suzhou Gstarsoft Co. Ltd. (Gstar). The ITC alleges copyright infringement, trade secret misappropriation, and breach of fiduciary duty. Gstar seeks reconsideration of a portion of the protective order previously entered in this case. Gstar also moves for an order compelling the ITC to respond to Gstar's interrogatories and for a further protective order. As explained below,

PAGE 1 – OPINION AND ORDER

the Court partially grants and partially denies Gstar's motion for reconsideration but denies Gstar's motion to compel and for a further protective order.

## BACKGROUND[1]

Founded in 1999 and headquartered in Portland, Oregon, the ITC is a consortium of computer aided design (CAD) software developers who develop and maintain the IntelliCAD software platform (IntelliCAD). Unlike other CAD developers, the ITC does not sell its software product, IntelliCAD, directly to end users. Instead, the ITC licenses IntelliCAD to consortium members, who pay annual fees for permission (a) to sell IntelliCAD "as is" to third-party end users or (b) to build their own proprietary products "on top of" IntelliCAD. The ITC's primary source of revenue comes from licensing the IntelliCAD platform and various components to its members. The IntelliCAD platform underlies the portfolio of all CAD products offered by consortium members. The ITC owns more than 20 registered U.S. copyrights relating to its IntelliCAD source code.

IntelliCAD is not conventional "open source" software. Access to the source code is allowed only to members, employees, and contractors of the ITC on an "as needed" basis. The ITC protects its source code by placing it in a secured source code repository. To secure source code access and distribution, the ITC requires members to sign restrictive covenant agreements and license back to the ITC bug fixes, modifications, and enhancements that members develop. ITC employees, contractors, and members' employees must sign agreements that require them to protect and maintain the confidentiality of the ITC's trade secret information, including the IntelliCAD source code. According to the ITC, it provides a professional "shared development"

---

[1] The factual background that follows is taken largely from the Second Amended Complaint (SAC) (ECF 32) and selected declarations.

environment for a limited scope of members, employees, and contractors, with access to proven development and testing tools.

Gstar was founded in Beijing, China in 1992. In 2001, Gstar relocated its headquarters to Suzhou, China. Gstar provides two-dimensional and three-dimensional CAD software and solutions for industries involving: architecture, engineering, and construction; mechanical and manufacturing; electrical and electronics; and geographic information systems, including surveying and mapping. Gstar provides CAD software and solutions for customers and partners in China and other countries. Gstar has approximately 400 employees, including executives, programmers, developers, and sales personnel, all of whom are based in China.

Gstar, formerly known as "Beijing Greatstar Technology Development Co., Ltd.," joined the ITC in 2002 as an associate member. Gstar later became a commercial member of the ITC, and obtained a license to the IntelliCAD source code, by entering into a commercial membership agreement with the ITC effective March 21, 2003. Gstar's commercial membership agreement was amended and restated by the parties effective July 9, 2008, December 1, 2011, and January 1, 2013. Under each of these commercial membership agreements, Gstar agreed to provisions protecting the IntelliCAD source code and prohibiting its use in the creation of competitive or derivative CAD platforms. The most recent commercial membership agreement fully executed between Gstar and the ITC is dated January 1, 2013 (CMA) and incorporates the ITC's "Membership Rules." *See* CMA (ECF 32-1). According to the ITC, Gstar would not have received access to the ITC's proprietary code and intellectual property without having agreed to the CMA and its predecessors.

Mr. Jiang Liang is the General Manager of Gstar's Research and Development Center for Platform Software. He has held that position since 2001 and has been employed by Gstar

since 1992. In September 2010, Gstar began a development project that would eventually be called "GstarCAD 8." Mr. Liang was the leader of Gstar's software development team for GstarCAD 8. According to Mr. Liang, in 2010 Gstar decided to develop a CAD product that was independent of the ITC's IntelliCAD. In July 2013, Gstar officially released GstarCAD 8. Mr. Liang adds that the functions of GstarCAD 8 were not fully completed and stable at the time of its official release, and Gstar spent another two years on further research and development. In October 2015, Gstar released GstarCAD 2016, which at that point was largely complete and stable, according to Gstar.

The ITC contends that GstarCAD 8 competes directly with IntelliCAD. Concerned that Gstar might have used IntelliCAD source code to create GstarCAD 8, the ITC, pursuant to the CMA and the ITC's Membership Rules, notified Gstar in August 2014 that the ITC would exercise its right to perform a source code audit of GstarCAD 8. Gstar refused to comply with the ITC's demand for an audit. Gstar also refused to pay its 2014 membership fees to the ITC. The ITC also alleges that Gstar began soliciting ITC members to leave the consortium and use Gstar's platform instead of IntelliCAD. The ITC sent a formal notice to Gstar in April 2015. In that notice, the ITC demanded that Gstar cure its violations by: (1) retracting solicitations; (2) scheduling a source code audit; and (3) affirming that Gstar had corrected any improper use of IntelliCAD, including its source code. Gstar refused to comply and declared its intention simply to leave its membership in the ITC.

In May 2015, the ITC commenced an arbitration proceeding against Gstar by filing a statement of claim with the Arbitration Service of Portland. According to the ITC, Gstar received notice but declined to participate in the arbitration hearing, which was conducted in September 2015 in Portland, Oregon. The arbitrator ruled for the ITC and sent his written decision to both

the ITC and Gstar. In October 2015, Gstar emailed the arbitrator, stating that Gstar believed that the arbitration award was improper because the ITC had presented "fake evidence" and "insufficient proof." In January 2016, the ITC filed an action in the U.S. District Court for the District of Oregon to confirm the arbitration award. Gstar received notice but did not appear. In February 2016, U.S. District Judge Michael W. Mosman confirmed the award and entered judgment for the ITC. *See IntelliCAD Tech. Consortium v. Suzhou Gstarsoft Co. Ltd.*, Case No. 3:16-mc-61-MO (D. Or.).

In the pending lawsuit, the ITC alleges that GstarCAD 8 and its derivatives (collectively, New GstarCAD) misappropriated significant portions of the ITC's proprietary source code. According to the ITC, the New GstarCAD is not merely an IntelliCAD "work-a-like" and does not merely share similar interfaces and commands. According to the ITC, New GstarCAD performs identically to prior versions of IntelliCAD. The ITC also contends that this duplication must be at the source code level and could not have been accomplished through coincidence or the application of similar programming logic. As a commercial member of the ITC, Gstar (and its developers) had access to the IntelliCAD source code.

As alleged by the ITC:

> Software naturally evolves with the development of each new release and as new technologies become available. This evolution results in distinctive signatures in the source code – much like the unique patterns in the genetic code of living organisms. Just as the existence of mutations and other anomalies can demonstrate genetic lineage, the existence of "bugs," non-working system variables, and other idiosyncrasies in software code can establish programming lineage. All software code has quirks, but no two independently developed pieces of code should have identical quirks.

SAC, ¶ 28. According to the ITC, the New GstarCAD displays precise idiosyncrasies and features that, the ITC alleges, could not have been introduced without the wholesale copying of

significant portions of the ITC's proprietary source code. *Id.* ¶ 29. In paragraph 29 of its SAC, the ITC identifies and describes many of these alleged idiosyncrasies and features.[2]

## DISCUSSION

### A. Gstar's Motion to Reconsider Protective Order

The original Protective Order in this case (ECF 49) did not include "revision history" in the definition of "Highly Confidential – Source Code." *See* Protective Order, ¶¶ 2.8 and 8.3(a). This would allow the disclosure of Gstar's source code revision history to ITC's President, Dave Lorenzo, together with ITC's outside attorneys and independent experts. Gstar asks the Court to reconsider this point.

The revision history of source code is typically a log or summary of changes made to that code, sometimes with explanatory comments. Indeed, some regard a revision history as tantamount to source code itself. In the Northern District of California's Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information or Trade Secrets, there is an optional provision for doing that. *See* https://www.cand.uscourts.gov/forms/model-protective-orders/ (§ 2.9) (lasted visited Dec. 18, 2020).

Gstar asserts that its revision history is no less revelatory of Gstar's source code and seeks only to keep its revision history out of the hands of decisionmakers at the ITC, a

---

[2] In his declaration filed earlier in this lawsuit, Gstar's Mr. Liang asserted that "Gstar decided to undertake developing its own CAD platform from the ground up, not dependent on any ITC source code." Liang Decl. (Feb. 27, 2020), ¶ 3 (ECF 17). Mr. Liang, however, did not explain how the many alleged IntelliCAD idiosyncrasies and bugs specifically identified by the ITC in its First Amended Complaint (ECF 14) came to appear in the New GstarCAD. In his second declaration, filed in support of Gstar's pending motions, Mr. Liang states that both GstarCAD and IntelliCAD are CAD products that are market alternatives to AutoCAD® and are often called "AutoCAD workalikes" or "AutoCAD alternatives." Liang Decl. (Oct. 22, 2020), ¶¶ 5-11 (ECF 59). In his second declaration, Mr. Liang also describes several of common software sources that developers often use in creating AutoCAD workalikes. *Id.*

PAGE 6 – OPINION AND ORDER

competitor. Gstar adds that its request would be unlikely to impede the ITC's ability to make its case because the ITC's outside attorney's and independent experts may still review Gstar's revision history.

The Court may, for good cause, issue a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specific way." Fed. R. Civ. P. 26(c)(1)(G). After a party seeking a protective order shows that the information at issue is a trade secret or otherwise confidential and that disclosure would be harmful, the burden shifts to the party seeking disclosure to show that disclosure is warranted. *See Vesta Corp. v. Amdocs Mgmt. Ltd.*, 2017 WL 714354, at *2 (D. Or. Feb. 21, 2017) (*Vesta II*); *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007).

The parties here do not dispute that revision history ordinarily is protected from disclosure to competitive decisionmakers. They also do not dispute that Gstar and the ITC are competitors or that the ITC's President, Dave Lorenzo, is one of the decisionmakers at the ITC. In response to Gstar's motion to reconsider, the ITC argues, as it did before when discussing the original protective order, that allowing Mr. Lorenzo to view the metadata and comments in the revision history for Gstar's source code is essential to the ITC's ability to prove that the source code for Gstar's product, GstarCAD 8, results from misappropriation of the ITC's trade secrets and copyrights. The ITC explains,

> Mr. Lorenzo must be able to view the revision history metadata as part of the revision selection process set forth in Section 8.3(a) of the Protective Order because (1) the ITC is limited to examining only four out of some 56,000 revisions of Gstar's source code, (2) Gstar agreed in the Commercial Membership Agreement ("CMA") to give the ITC access to Gstar's source code, and (3) Gstar should not be rewarded for failing to comply with its obligations under the CMA, as confirmed by the prior Arbitration

PAGE 7 – OPINION AND ORDER

> Award and Judge Mosman's order in Case No. 3:16-mc-00061-MO.

ECF 53 at 2. The ITC adds:

> Even though Gstar indicated that it has some 56,000 versions of GstarCAD 8 in its revision history control system(s), Gstar only agreed to allow the ITC to select four revisions for comparison. This means that the ITC needs to be very careful and strategic in selecting the right revisions that are most likely to provide evidence of illegal misappropriation and copying. This is unlike the typical situation, in which the entire revision control system is to be produced and accessible to the receiving party.

*Id*. at 4 (footnote omitted).

The ITC is correct in stating that the negotiated audit process set forth in Section 8 of the Protective Order allows only a scant opportunity for the ITC's attorneys and experts to inspect Gstar's source code. Thus, the ITC argues, it needs the expertise of Mr. Lorenzo in a way that might not otherwise be needed if the ITC's attorneys and experts simply could inspect all of Gstar's source code. The ITC explains:

> After years of working on and with the IntelliCAD source code, Mr. Lorenzo is the only one who would have the knowledge and experience on the revision selection video call to view the GstarCAD 8 revision history metadata and to quickly and efficiently know which revisions are most likely to contain discoverable evidence of misappropriation and copying. There is no way that he could effectively communicate all the possible permutations of information to the ITC's experts or its counsel as to which particular time frames, which particular amounts or sections of code that were revised, or how particular revisions might relate to the ITC's source code, etc.

*Id*. The ITC's explanation is reasonable, based on Gstar's insistence that in this lawsuit the ITC may only examine four out of more than 56,000 specified revisions of the GstarCAD 8 source code.

The ITC's request to allow Mr. Lorenzo access to Gstar's revision history is even stronger because Gstar had agreed in the CMA to allow the ITC (without excluding

PAGE 8 – OPINION AND ORDER

Mr. Lorenzo) to inspect and audit Gstar's source code during the life of the CMA and for three years after its termination. The ITC timely demanded such an inspection and audit, but Gstar refused. After an arbitration, in which Gstar declined to participate, the arbitrator awarded the ITC the right to conduct such an inspection and audit, again without excluding Mr. Lorenzo. That award was later confirmed by a federal court, also in a proceeding in which Gstar received notice but chose not to participate. Still, the audit never occurred. As noted, nothing in the CMA's inspection and audit provisions would have precluded Mr. Lorenzo from being part of that audit process and seeing what would have been inspected, including Gstar's source code and revision history. Thus, the Court denies Gstar's primary argument.

Gstar, however, alternatively asserts that Mr. Lorenzo's access to revision history under Section 5.4.2(a) of the CMA would have been limited to viewing Gstar's revision history before May 18, 2018 (three years after termination of the CMA), and the Court should now impose such a temporal limit. The parties agree that the CMA terminated on May 18, 2015, and that Section 5.4.2(a) of the CMA required Gstar to "make its premises and needed records available for inspection" by the ITC only "for a period of three years effective on the date of the termination." *See* CMA, ¶ 5.4.2(a) (ECF 32-1 at 9). ITC did not directly respond to Gstar's alternative argument, and the Court agrees with Gstar on this point.

Further, restricting Mr. Lorenzo's access to Gstar's revision history to whatever was created on or before May 18, 2018 should limit any potential competitive harm to Gstar while also allowing the ITC an adequate opportunity to determine whether GstarCAD 8 and its derivatives misappropriated significant portions of the ITC's proprietary source code. Thus, the Court will modify the Sections 2.8 and 8.3(a) of the Protective Order to preclude Mr. Lorenzo

PAGE 9 – OPINION AND ORDER

from having access to Gstar's revision history after May 18, 2018. Gstar's Motion to Reconsider Protective Order (ECF 50) is partially granted and partially denied.

**B.     Gstar's Motion to Compel Interrogatory Responses and for Protective Order**

Gstar requests: (1) an order compelling the ITC to supplement its response to Interrogatory No. 1 to identify with greater particularity the trade secrets that ITC contends Gstar misappropriated; (2) a protective order excusing Gstar from complying with ITC's demand under Rule 34 to inspect Gstar's source code until after ITC identifies its trade secrets with greater particularity; and (3) an order compelling ITC to supplement its responses to Interrogatories Nos. 2-7 and 9, which relate to ITC's response to Interrogatory No. 1 and which Gstar contends currently lack sufficient detail. Because of the interrelatedness of these three requests, the Court will discuss them collectively.

The ITC has broadly defined its trade secrets as its "source code, processes, and tools." Gstar argues that such a definition is too general, vague, and bereft of detail to afford Gstar a fair opportunity to defend itself against the ITC's claims. Gstar adds that the ITC should have to identify its trade secrets *before* Gstar must produce in discovery its highly confidential source code to ITC. Gstar also asserts that if ITC does not identify its trade secrets with reasonable particularity at the start of the case, then Gstar will be deprived of the opportunity to conduct the needed research and third-party discovery to disprove ITC's eventual claims of ownership of trade secrets that Gstar might later contend does not belong to the ITC.[3]

---

[3] The IntelliCAD source code was originally built and owned by third parties. *See* SAC, ¶¶ 8-11 (stating that Boomerang Technology, Inc. built IntelliCAD, that Visio Corporation acquired IntelliCAD from Boomerang in 1997 and further developed IntelliCAD, and in 1999 Visio divested itself of IntelliCAD by creating the ITC and granting the ITC an exclusive, irrevocable license to the IntelliCAD source code just before Microsoft acquired Visio in 2000). According to Gstar, however, some industry sources have suggested that Visio, and not the ITC, retained ownership of the IntelliCAD source code.

Gstar served its First Set of Interrogatories to Plaintiff on July 23, 2020. ECF 60-1. Gstar's Interrogatory No. 1 expressly asked the ITC to identify each trade secret that the ITC alleges has been "*misappropriated*" by Gstar. *Id*. at 4 (emphasis added).[4] The ITC responded answering:

> *The ITC's IntelliCAD source code, processes, and tools*. The ITC reserves the right to amend this response as new or additional facts and information are disclosed or otherwise come to light during the discovery and audit process. Gstar's refusal to comply with the Commercial Membership Agreement ("CMA"), the arbitration award, and this Court's judgment and order resulting from the Audit Arbitration has unnecessarily interfered with the ITC's ability to give more specific answers to this interrogatory at this time.

ECF 60-2 at 2 (emphasis added).

Two weeks later, counsel for Gstar and the ITC conferred. Counsel for Gstar explains that during that conference she "*clarified* that Gstar's Interrogatory No. 1 seeks identification of *all trade secrets that ITC claims to have disclosed* to Gstar, rather than trade secrets that ITC claims that Gstar misappropriated." ECF 60, ¶6 (emphasis added). In Gstar's pending motion, Gstar acknowledges that it is "premature at this time" to ask the ITC to identify all misappropriated trade secrets. Instead, Gstar seeks identification of *all trade secrets that the ITC ever disclosed to Gstar*. In its motion, Gstar states:

> But Gstar does not seek in Interrogatory No. 1 identification of *misappropriated* trade secrets, *as Gstar agrees that would be premature at this time* (and, of course, denies misappropriation). Gstar's Interrogatory No. 8 seeks identification of each instance of alleged misappropriation, and Gstar does not move to compel supplementation of that interrogatory response at this time. Rather,

---

[4] In Gstar's Interrogatory No. 1, Gstar asked: "Identify with reasonable particularity each trade secret that You allege *has been misappropriated by Gstar*, including, but not limited to, any and all trade secrets You refer to in paragraphs 16 and 42-50 of the Complaint." ECF 60-1 at 4 (emphasis added).

> in this motion, Gstar seeks identification of ITC's trade secrets that ITC disclosed to Gstar.

ECF 58 at 4 n.1 (first emphasis in original; second emphasis added). Gstar, however, has never propounded any interrogatory asking the ITC to identify *all* trade secrets that ITC has ever disclosed to Gstar.

On September 21, 2020, the ITC served a request under Rule 34(a) of the Federal Rules of Civil Procedure, demanding to inspect "Gstar's source code for GstarCAD and its derivatives and the related revision history(ies) and source code repository(ies)." ECF 60-6 at 5-6. In response, Gstar objects, among other things, "to providing its source code, revision history, source code repositories, and any other trade secret information *prior to ITC defining its alleged trade secrets with reasonable particularity*." *Id*. at 6 (emphasis added). According to Gstar, "[t]he key issue before this Court is whether ITC has described its trade secrets with sufficient particularity so as to require Gstar, *at this time*, to disclose its own trade secrets in response to ITC's request to inspect Gstar's source code." ECF 58 at 12 (emphasis added). To distill the issue even further, the key, as the Court views the matter, focuses on the phrase "at this time."

In support of its argument that, *at this time*, the ITC should have to identify its trade secrets with greater particularity than simply describing them as its "source code, processes, and tools," Gstar cites cases inapposite based on their procedural context. First, Gstar cites *DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788 (D. Or. Sept. 12, 2019). In that case, the Magistrate Judge recommended granting a defendant's motion for *summary judgment* after the plaintiff continued to describe its alleged trade secrets merely as its "source code," holding that the "Plaintiff's failure to describe its trade secrets with sufficient particularity is fatal to its trade secret misappropriation claims." *Id*. at *10. Second, Gstar cites *Keywords, LLC v. Internet Shopping Enter., Inc*., 2005 WL 8156440 (C.D. Cal. June 29, 2005). In that case, the court

PAGE 12 – OPINION AND ORDER

denied the plaintiff's motion for preliminary injunction because the plaintiff had "failed to identify what portions of the source codes constitute trade secrets, and the court thus cannot determine whether they meet the UTSA's definition of a trade secret." *Id*. at *17. Third, Gstar cites *Citcon USA, LLC v. RiverPay Inc*., 2019 WL 2603219, at *2 (N.D. Cal. June 25, 2019). In that case as well, the court denied the plaintiff's motion for preliminary injunction because the plaintiff had failed to identify with reasonable particularity what source code was allegedly misappropriated. Fourth, Gstar cites *Soc. Apps, LLC v. Zynga, Inc*., 2012 WL 2203063, at *5 (N.D. Cal. June 14, 2012). In that case, California provided the substantive law for the plaintiff's trade secret claim, and the federal court in that action applied California Code of Civil Procedure § 2019.210. *Id*. at *1-2.[5] In the case now before the Court, however, Gstar is not moving for summary judgment, the ITC has not moved for a preliminary injunction, and Oregon law—rather than California law—applies.

The strongest case that supports Gstar's argument is *Vesta Corp. v. Amdocs Mgmt. Ltd*., 147 F. Supp. 3d 1147 (D. Or. 2015) (*Vesta I*). In that matter, the plaintiff similarly alleged misappropriation of trade secrets. U.S. District Judge Marco Hernandez granted the defendant's motion for a protective order that postponed the need for the defendant to respond to the plaintiff's discovery requests until after the plaintiff specified "with reasonable particularity" the trade secrets that were allegedly misappropriated. *Id*. at 1149. In that case, however, the court explained that there is no "talismanic approach" to the question of how specifically a plaintiff

---

[5] This California statute provides: "In any action alleging the misappropriation of a trade secret under the Uniform Trade Secrets Act (Title 5 (commencing with Section 3426) of Part 1 of Division 4 of the Civil Code), before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity subject to any orders that may be appropriate under Section 3426.5 of the Civil Code."

must describe its trade secrets before it may obtain discovery from a defendant. *Id.* at 1151. As the court explained:

> A careful review of the many cases presented by both parties makes clear that there is no bright-line answer as to the degree of particularity that must be disclosed in order for discovery to proceed in a trade secrets case. Rather, the Court's analysis in each case is fact-intensive and the outcome is fact-specific.

*Id*. at 1150

In *Vesta I*, Judge Hernandez noted two decisions in other cases in which the undersigned judge held that a plaintiff did not have to provide even more detail about its misappropriated trade secrets before the defendant would have to respond to the plaintiff's discovery. *See Nike, Inc. v. Enter Play Sports, Inc*., 305 F.R.D. 642, 645-46 (D. Or. 2015) (finding that the plaintiff's description of its trade secrets was sufficient when the defendant was able adequately to understand and respond to the allegations in the complaint); *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630, 641 (D. Or. 2015), *reconsideration den*., 104 F. Supp. 3d 1150, 1160 (D. Or. 2015) (finding that the plaintiff had many trade secrets and no way of knowing which secrets the defendant misappropriated until after the plaintiff conducted initial discovery).

Judge Hernandez then explained how the situation in *Vesta I* differed from the circumstances in *St. Jude*. He said:

> However, this case differs from other cases where plaintiffs may face an inherent difficulty identifying what portions of trade secrets have been misappropriated prior to receipt of discovery from defendants. * * * Unlike the plaintiff in *St. Jude*, for example, Plaintiff here should know exactly what trade secrets were shared with Defendants because such disclosures took place in a discreet number of joint meetings and exchanges of information over a defined time frame. * * * This is not a case where Defendants stole large volumes of documents or secrets from Plaintiff without Plaintiff's knowledge. Similarly, Plaintiff fails to provide any argument that premature trade secret identification in this case risks encompassing non-trade secret information or may be too specific to capture all misappropriated trade secrets.

PAGE 14 – OPINION AND ORDER

147 F. Supp. 3d at 1154. In a more recent case, Judge Hernandez denied a defendant's motion to compel more definite descriptions of trade secrets by a plaintiff, explaining: "A plaintiff does not have to prove their trade secret claim prior to conducting discovery, but it must provide enough detail about its alleged trade secrets to at least suggest that the alleged trade secrets might be legally protectable." *Opal Labs, Inc. v. Sprinklr, Inc.*, 2019 WL 6528589, at *1 (D. Or. Dec. 4, 2019) (simplified).

One particularly instructive case identifying the criteria that a district court should consider in deciding the question now facing this Court is *BioD, LLC v. Amnio Tech., LLC*, 2014 WL 3864658 (D.Ariz. Aug. 6, 2014). In that case, the court explained:

> Determining whether a trade secret has been misappropriated usually involves examining things that the other party considers its own trade secrets. There is no privilege excepting trade secrets from discovery, but courts must exercise discretion to avoid unnecessary disclosures of such information. [P]laintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets.

*BioD*, 2014 WL 3864658, at *4 (alterations in original) (quoting *Dura Global Technologies, Inc. v. Magna Donnelly, Corp.*, 2007 WL 4303294, at *2 (E.D.Mich. Dec. 6, 2007)). The Court in *BioD* continued, observing: "A plaintiff also might *not* be required to identify its trade secrets with reasonable particularity prior to discovery." *BioD*, 2014 WL 3864658, at *5 (emphasis added).

> [C]ourts have identified at least three policies which support allowing the trade secret plaintiff to take discovery prior to identifying its claimed trade secrets. First, courts have highlighted a plaintiff's broad right to discovery under the Federal Rules of Civil Procedure. Second, the trade secret plaintiff, particularly if it is a company that has hundreds or thousands of trade secrets, may have no way of knowing what trade secrets have been misappropriated until it receives discovery on how the defendant is operating. Finally, if the trade secret plaintiff is forced to identify

PAGE 15 – OPINION AND ORDER

> the trade secrets at issue without knowing which of those secrets
> have been misappropriated, it is placed in somewhat of a
> "Catch-22" [because] [i]f the list is too general, it will encompass
> material that the defendant will be able to show cannot be trade
> secret. If instead it is too specific, it may miss what the defendant
> is doing.

*BioD*, 2014 WL 3864658, at *5 (alterations in original) (quotation marks and citation omitted). The Court views the pending dispute as factually closer to the circumstances in *St. Jude* and *Nike*, than the situation in *Vesta I*. The Court also considers the pending dispute under the three policies identified in *BioD* that support allowing a trade secret plaintiff to take discovery before identifying its claimed trade secrets with greater specificity.

The Court also notes that the October 2020 Final Post-Public-Comment Version of The Sedona Conference Commentary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases addresses a similar issue. In that Commentary, the well-respected Sedona Conference presents "Guidelines for a Trade Secret Identification." Guideline 8 states:

> *If the plaintiff claims that the defendant has taken files or other
> materials*, the court may allow motion practice and/or *discovery*
> relating to the return or *inspection* of such files or materials *prior
> to requiring identification of asserted trade secret contained within
> such files or materials*.

The Sedona Conference, *Commentary on the Proper Identification of Asserted Trade Secrets in Misappropriation Cases*, 22 SEDONA CONF. J. 223, 261 (forthcoming 2021) (emphasis added) (available at https://thesedonaconference.org/download-publication?fid=5598) (last visited Dec. 18, 2020).

Gstar had access to the IntelliCAD source code for more than 12 years, from 2003 through 2015. Also, as alleged by the ITC, "the New GstarCAD displays precise idiosyncrasies and even identical bugs – features that could not have been introduced without the wholesale copying of significant portions of the ITC's proprietary source code." SAC, ¶ 29. (ECF 32).

PAGE 16 – OPINION AND ORDER

Indeed, the ITC devotes more than five pages to providing a detailed description of those idiosyncrasies and bugs. *Id*. This is more than enough detail to allow Gstar to respond to the ITC's allegations—as evidenced by Gstar already answering the ITC's SAC. *See* Answer (ECF 34). Further, in its Answer to ¶ 27 of the SAC, Gstar admits that "certain Gstar personnel had the right to access IntelliCAD source code when Gstar was a commercial member of the ITC."

In its Answer to ¶ 29 of the SAC, however, Gstar asserts that, among other things, "AutoCAD workalikes, like IntelliCAD and GstarCAD, use system variables found in AutoCAD for the purpose of maintaining compatibility with AutoCAD." Thus, Gstar's explanation for the identified identical "idiosyncrasies and bugs" found in both IntelliCAD and GstarCAD may be that they both came from the same sources and that the ITC is not the owner of those sources. Gstar places this issue under the heading: "ITC fails to recognize the import of third-party ownership of portions of its code." *See* ECF 64 at 9-10. As the case develops, this may be an important area for the parties' discovery and the court's (or a jury's) ultimate resolution.

The Court believes that the most efficient, reasonable, and fair way to proceed is to allow the ITC to inspect Gstar's source code under appropriate conditions of confidentiality. Then, after a reasonable (but not too long) time, the ITC will need to provide more specific responses to Gstar's interrogatories, although limited to the specific trade secrets that the ITC contends were misappropriated by Gstar (*i.e.*, not *all* trade secrets owned by the ITC). After that, the parties will likely take discovery, including potentially third-party discovery, to determine the source and ownership of the specific trade secrets (*e.g.*, the specific source code portions) at issue in this lawsuit. Ownership then may be determined at summary judgment or, if there are genuine factual disputes, at trial. All of that may come, but at its proper time and in its proper

order. For now, Gstar's Motion to Compel Interrogatory Responses and for Protective Order (ECF 58) is denied.

## CONCLUSION

Gstar's Motion to Reconsider Protective Order (ECF 50) is partially granted and partially denied. Gstar's Motion to Compel Interrogatory Responses and for Protective Order (ECF 58) is denied.

**IT IS SO ORDERED.**

DATED this 21st day of December, 2020.

                                                  */s/ Michael H. Simon*
                                                  Michael H. Simon
                                                  United States District Judge